James H. Power
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.power@hklaw.com
       marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Canpotex Shipping Services Limited*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CANPOTEX SHIPPING SERVICES LIMITED,
individually and on behalf of
M/V GLOBAL PHOENIX (IMO No. 9565053),
M/V CMB GIULIA (IMO No. 9588419), and,
M/V ASTON TRADER II (IMO No. 9392731),

                                    Plaintiff,

          - against -

O.W. BUNKERS (UK) LIMITED, O.W. SUPPLY &
TRADING A/S, CHEVRON MARINE PRODUCTS
LLC, ING BANK N.V.

                                    Defendants.

---

15 Civ. _____ (    )


**COMPLAINT**
**FOR INTERPLEADER**

Plaintiff Canpotex Shipping Services Limited ("Canpotex" or "Plaintiff"), by and through

its attorneys Holland & Knight LLP, bring this action pursuant to Rule 9(h), as and for their

Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a) and 2361 and alleges, upon

information and belief, as follows:

## THE PARTIES

1.      Canpotex is a foreign corporation or business entity organized and existing pursuant to the laws of Canada, with an office and place of business at P.O. Box 1600, Suite 400, 111 2nd Avenue South, CA-S7K 3R7 Saskatoon, Saskatchewan, Canada.

2.      Defendant O.W. Bunkers (UK) Limited ("O.W. UK") is a corporation or business entity organized and existing pursuant to the laws of a foreign country, with an office and place of business at Pilgrim House, 2-6 William Street, GB-SL4 1BA Windsor, Berkshire, Great Britain.

3.      Defendant O.W. Supply & Trading A/S ("O.W. Denmark") is a corporation or business entity organized and existing pursuant to the laws of a foreign country, with an office and place of business at Stigsborgvej 60, 9400 Noerresundby, Denmark.

4.      Defendant Chevron Marine Products LLC ("Chevron") is a corporation or business entity organized and existing pursuant to the laws of California, with an office and place of business at 6001 Bollinger Canyon Road, Building 1, 3rd Floor, San Ramon, California 94583.

5.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed. R. Civ. P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Canpotex for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the following vessels: 1) M/V Global Phoenix (IMO No. 9565053); 2) M/V

CMB Giulia (IMO No. 9588419); and 3) M/V Aston Trader II (IMO No. 9392731) (collectively, the "Vessels").

7.      This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payments in question: (a) at least two of the claimants are of diverse citizenship; (b) the disputes between the claimants each involve funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Plaintiff, on behalf of the Vessels is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the principal sum of at least $1,112,352.75, which is the amount due for three fuel deliveries to the Vessels between October 16, 2014 through October 31, 2014.   Additionally, Canpotex will seek to deposit an interest component of 6% to the principal sum in the amount of $66,741.16 for a total deposit of $1,179,093.91.

8.      This Court has personal jurisdiction over defendants O.W. UK and O.W. Denmark pursuant to the terms of the applicable bunker supply contracts and the Fixed Price Trading Agreement with O.W. Denmark, which adopts the New York law and jurisdiction clause of the physical supplier, Chevron.

9.      This Court also has personal jurisdiction over defendant Chevron pursuant to 28 U.S.C. § 2361, and by Chevron's New York choice of law and dispute resolution pursuant to the Terms of Sale for marine fuel.

10.      This Court has personal jurisdiction over ING to the extent it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute and to the extent that it is an alleged assignee of the receivables of O.W. UK and/or O.W. Denmark.   Additionally, ING transacts business within the jurisdiction of this Court and has a place of business at 1325 Avenue of the Americas, New York, New York 10019.

11.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

12.     This is an action for interpleader with respect to the principal sum of $1,112,352.75, representing the amount due for the supply of bunkers to the Vessels.  With respect to payment for such supply, O.W. UK, O.W. Denmark, Chevron, ING or some other third party have and  may have conflicting claims as to ownership of the fuel payment funds owed by Canpotex for the purchase of and  receipt of a specific and finite quantity of bunkers (fuel) in the Port of Portland, Oregon by the Vessels (the "Fuel Deliveries").

## FACTUAL BACKGROUND

## M/V GLOBAL PHOENIX

13.     Canpotex is the time charterer of M/V Global Phoenix.

14.     On or about October 7, 2014, Canpotex ordered bunkers to be loaded onboard and consumed by the vessel M/V Global Phoenix from O.W. UK.  O.W. UK is apparently a corporate affiliate of O.W. Denmark.  A true and correct copy of the Sales Order Confirmation received from O.W. UK is attached hereto as Exhibit 1.  On this document, the "supplier" is identified as Chevron.

15.     The bunkers were delivered to the vessel Global Phoenix on October 16, 2014.  A bunker delivery note was issued by Chevron.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 2.

16.     An invoice was issued to Canpotex on October 16, 2014 by O.W. UK for the supply of bunkers to Global Phoenix.  The invoice directs payment of $410,691.96 to O.W. UK, to an ING account.  A true copy of the bunker invoice is attached hereto as Exhibit 3.

**M/V CMB GIULIA**

17.     Canpotex is the time charterer of M/V CMB Giulia.

18.     On or about October 14, 2014 Canpotex ordered bunkers to be loaded onboard and consumed by the vessel CMB Giulia from O.W. UK.  A true and correct copy of the Sales Order Confirmation received from O.W. UK is attached hereto as Exhibit 4.  On this document, the "supplier" is identified as Chevron.

19.     The bunkers were delivered to the vessel CMB Giulia on October 20, 2014.  A bunker delivery receipt was issued by Chevron.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 5.

20.     An invoice was issued to Canpotex on October 20, 2014 by O.W. UK for the supply of bunkers to CMB Giulia.  The invoice directs payment of $369.618.84 to O.W. UK, to an ING account.  A true copy of the bunker invoice is attached hereto as Exhibit 6.

**M/V ASTON TRADER II**

21.     Canpotex is the time charterer of M/V Aston Trader II.

22.     On or about October 17, 2014 Canpotex ordered bunkers to be loaded onboard and consumed by the vessel M/V Aston Trader II from O.W. UK.  A true and correct copy of the Sales Order Confirmation received from O.W. UK is attached hereto as Exhibit 7.  On this document, the "supplier" is identified as Chevron.

23.     The bunkers were delivered to the vessel Aston Trader II on October 31, 2014.  A bunker delivery receipt was issued by Chevron.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 8.

24.     Canpotex has not received a formal invoice for the supply of bunkers to Aston Trader II.  However, based on the pricing listed on the Sales Order Confirmation and the quantity

of bunkers delivered as reflected on the bunker delivery receipt, the sum of $138,963.00 is owed for the supply of these bunkers.

## FACTS COMMON TO ALL THE FUEL DELIVERIES

25.     On or about February 14, 2014 Canpotex entered into a Fixed Price Trading Agreement with O.W. Denmark for the delivery of marine fuel at a fixed price.  A true and correct copy of the Fixed Price Trading Agreement is attached hereto as Exhibit 9.

26.     As a result of the worldwide collapse of the various companies of the O.W. Bunker group, the Fuel Deliveries have resulted in a number of competing potential *in personam* and *in rem* claims directed at Canpotex and the Vessels chartered by Canpotex.

27.     The terms and conditions of the Fixed Price Trading Agreement with O.W. Denmark for the sale of bunkers includes clause L.4(a): "These Terms and Conditions are subject to variation in circumstances where the physical supply of the fuel is being undertaken by a third party.  In such circumstances, these terms and conditions shall be varied accordingly..." Additionally, clause L.4(b) states: "Without prejudice to the generality of the foregoing, in the event that the third party terms include: (iii) A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms."

28.     The Chevron terms and conditions at clause 13 state that "This Contract shall be governed and construed in all particulars by the laws of the State of New York, United States of America, without regard to those laws that would reference the laws of another jurisdiction." Clause 14 provides for arbitration in New York.  A true and correct copy of the Chevron terms of sale are attached hereto as Exhibit 10.

29.     On November 7, 2014, O.W. Bunker & Trading A/S and certain of its Danish subsidiaries and affiliates filed for bankruptcy in their home jurisdiction of Denmark.  Thereafter

many other O.W. entities and/or affiliates filed for bankruptcy in various other jurisdictions around the world. No foreign O.W. bankruptcy proceeding has been recognized in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

30.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include O.W. UK), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

31.     On December 12, 2014 Charles MacMillan of Beever and Struthers was appointed as the Administrator of O.W. UK. On January 16, 2015 the Administrator advised that it had entered into a Co-operation Agreement with ING for the collection of receivables assigned to ING. The Administrator instructs that all amounts owed shall be paid to the ING account set out on the O.W. UK fuel delivery invoices. A true and correct copy of the Administrator's letter is attached hereto as Exhibit 11.

## POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

32.     Due to the bankruptcy filings of O.W. Denmark, O.W. UK, and other O.W. group entities, O.W. UK, O.W. Denmark, Chevron and ING have sought or are expected to seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessels.

33.     Under United States maritime law, the contract supplier (such as O.W. UK) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel. Additionally, under certain circumstances, a physical supplier (or transporter) of the fuel (such as Chevron) may also assert a maritime lien on that vessel.

34      Moreover, other parties, such as ING, have asserted a right to payment for the Fuel Deliveries (see Exhibit 11)   Upon information and belief ING's claims are based on assignments of receivables by various O W  entities including but not limited to O W  UK and O W  Denmark

35      The Vessels regularly trade in the United States, as evidenced by the location of the fuel deliveries at Portland, Oregon, and are due to call at various ports in the United States and will face arrest pursuant to Supplemental Admiralty Rule C by the defendants claiming to assert a maritime lien,[1] which would cause harm to Plaintiff, delay the Vessels, affect innocent third parties with interests in the Vessels' cargo and generally inhibit and interfere with maritime commerce

36      Canpotex presently has control over the funds invoiced for the Fuel Deliveries to the Vessels  Plaintiff disclaims any interest in the amount invoiced for the supply of bunkers to the Vessels

37      Canpotex cannot ascertain whether the amount owed for the Fuel Deliveries should be paid to O W  UK, O W  Denmark  Chevron or ING in order to extinguish all maritime liens and/or other claims against Canpotex and the Vessels and to prevent the Vessels' arrest or attachment in this District or elsewhere and to prevent double liability for the Fuel Deliveries

38      The competing claims of the Defendants or other third parties will likely expose Canpotex and the Vessels to multiple liabilities in connection with the payment of the bunker invoices in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims

---

[1] Plaintiff makes no assertion nor take a position as to the validity of any of the potentially asserted maritime lien  or other claims by any of the Defendants or whether O W  UK or O W  Denmark has validly assigned any maritime lien or other claims to ING  These issues remain to be decided

39.     Canpotex, acting on behalf of the Vessels, is entitled to deposit with the Court the sum of at least $1,112,352.75, representing the amount due pursuant to the invoices issued by O.W. UK for the Fuel Deliveries, and require that O.W. UK, O.W Denmark, Chevron, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

40.     Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery, Plaintiff is prepared to deposit an additional amount ($66,741.16) constituting 6% interest per annum or such other amount as the court deems just and proper. Thus, the total amount of the proposed deposit is calculated to be $1,179,093.91, inclusive of one year of interest.

41.     After depositing the sum of $1,179,093.91 with the Court. Canpotex is entitled to be discharged from further *in personam* liability with respect to the funds and liability for payment for the Fuel Deliveries. The Vessels are similarly entitled to be discharged from any maritime lien against it arising from the Fuel Deliveries as described herein and as reflected in Exhibits 1 - 8.

WHEREFORE, Plaintiff Canpotex Shipping Services Limited, individually and on behalf of the vessels M/V Global Phoenix, M/V CMB Giulia and M/V Aston Trader II, respectfully requests that this Court:

(i)     determine which of the defendants is entitled to the Fuel Delivery funds, or, in the alternative, the share of each defendant, if any;

(ii)    enjoin O.W. Bunkers (UK) Limited, O.W. Supply & Trading A/S, Chevron Marine Products LLC, ING Bank, N.V. and any later-identified claimants from commencing any

action against Canpotex Shipping Services Limited or the vessels M/V Global Phoenix, M/V CMB Giulia and M/V Aston Trader II *in rem*, including but not limited to the arrest or attachment of the Vessels in any port, pursuant to Supplemental Admiralty Rules C or B based on the assertion of any *in rem* claim or *in personam* claim directed against Canpotex for the provisions of the bunkers referred to herein as the Fuel Deliveries;

(iii)    discharge Canpotex Shipping Services Limited from any liability on any claim that has been made or may in the future for the Fuel Deliveries upon Plaintiff's deposit of $1,179,093.91 into this Court's registry, or such other amount the Court finds sufficient to discharge Canpotex and the Vessels from liability for the Fuel Deliveries;

(iv)    discharge the Vessels from any liability on any claim that has been made or may in the future be made for the Fuel Deliveries upon Plaintiff's deposit of $1,179,093.91 into this Court's registry;

(vi)    award Plaintiff its costs and attorneys' fees in bringing this action and in maintaining this action if claimants unreasonably object; and

(vii)    award the return of any amount remaining in the registry (e.g., the interest deposit) to the Plaintiff upon the ultimate disposition of claims to the deposited Fuel Delivery funds; and

(viii)    award Plaintiff such other and further relief including equitable relief available under admiralty which this Court may deem just and proper.

Dated:  New York, New York
       February 24, 2015

                    HOLLAND & KNIGHT LLP

                    By: _____
                    James H. Power
                    Marie E. Larsen
                    31 West 52nd Street
                    New York, New York 10019
                    Telephone:  212-513-3200
                    Telefax: 212-385-9010
                    Email:  james.power@hklaw.com
                            marie.larsen@hklaw.com

                    *Attorneys for Plaintiff Canpotex Shipping Services*
                    *Limited, individually and on behalf of*
                    *M/V GLOBAL PHOENIX (IMO No. 9565053),*
                    *M/V CMB GIULIA (IMO No. 9588419), and,*
                    *M/V ASTON TRADER II (IMO No. 9392731)*

34515620v3

# EXHIBIT 1

**OW BUNKERS (UK) LTD.**
**OWB UK RS**

## W Bunker

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111  2nd Avenue South
CA-S7K 3R7 Saskatoon, Saskatchewan
Canada
Timur Rudnitskiy

First Floor, Pilgrim House
2-6 William Street
Windsor, Berkshire SL4 1BA
Great Britain
Phone  +44 1753 483300
Fax     +44 1753 483310
E-mail  owbunkersuk@owbunker com
Internet  http www owbunker com
Reg No  3978855
ING Bank N V
IBAN  NL26 INGB 0020 1180 31
IBAN  NL10 INGB 0651 3696 81
SWIFT  INGBNL2A
IBAN  NL26 INGB 0020 1180 31
SWIFT  INGBNL2A

## Sales Order Confirmation

| Sales Order No. | **24-29015** |
|---|---|

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | GLOBAL PHOENIX (IMO  9565053) |
| Port | PORTLAND(OR USA) |
| Delivery date | Between 11  October 2014 and 14  October 2014 |
| Seller | OW BUNKERS (UK) LIMITED |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV GLOBAL PHOENIX AND/OR CANPOTEX SHIPPING SERVICES LTD |

London  7  October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 600,00-750,00 | MT | Fueloil 380-CST 3,5% | USD | 622,00 | MT | Chevron Marine Products LLC |
| 1,00 | LPS | Environmental fee | USD | 60,00 | LPS | Chevron Marine Products LLC |

| | |
|---|---|
| Agent | Willhelmsen |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 RMG380 Booming fee if applicable USD 1750 lps MARPOL ANNEX COMPLIANCE CONFIRMED |

We thank you for this nomination.

**Kind Regards**

**Giorgia Franchini**

| | |
|---|---|
| Direct | +44 1753 483 306 |
| Mobile | +44 7977 462 555 |
| Yahoo ID | gfr_owbunker |
| E-Mail | gfr@owbunker com |
| Office E-Mail | owbunkersuk@owbunker com |

**OW BUNKERS (UK) LTD.**
**OWB UK RS**

**W Bunker**

TERMS AND CONDITIONS.
-------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is
requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified
quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any
dispute regarding quality to be settled by testing these retained samples by an independent laboratory at
port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and
Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall
be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to OW BUNKERS
(UK) LIMITED as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the
terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for
Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested
Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid
quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR
UNDERSTANDING.

**OW BUNKERS (UK) LTD.**
**OWB UK RS**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge  If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before  ALL tanks to be checked and measured including actual temperature  of cargo – also including those tanks said not to be included in the particular supply (idle tanks)  Compare measurements and verify the quantities as per barge ullage tables  When in full agreement please sign the ullage/sounding report for Before Supply figures  If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

DURING BUNKERING

Always place a watchman to witness safe operation including also proper and correct sampling  The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling  Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples  Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes   All seal numbers to be inserted into the Bunker Delivery Receipt (BDR)  The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose, and any un agreed attempts to transfer air via same should cause immediate stoppage unless the use of air  is caused by stripping of barge tanks  which stripping to be agreed in advance by both parties  If air is blown on continued basis  and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain  the time (hours from/to) that airblow was notified

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply  Pay special attention hereto and take all necessary precautions to observe, which includes
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
- Agree with the barge when and if they are going to make stripping of their tanks
- Check and note the draft fore, mid and aft on the barge before and after supply to compare
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master

AFTER COMPLETION

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank  Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor  If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply

QUANTITY COMPLAINTS

# EXHIBIT 2

**Chevron**

| Port/Delivery Location | | IMO Number of Receiving Vessel |
|---|---|---|
| PANAMA | | 9 5 6 5 0 5 3 |

| Bunkers Delivered to M/V of S/S | Vessel Flag | Next Port of Call |
|---|---|---|
| GLOBAL PHOENIX | PANAMA | BRAZIL |

| Owner/Operator or Account of | Ship's Agent | Voyage Destination |
|---|---|---|
| O. W. BUNKER USA | WILHELMSEN | |

**Bunker Delivery Note**

| Loading Terminal | Contracting Company |
|---|---|
| PTSI- PORTLAND, OR- USA | OLYMPIC TUG & BARGE |

| Product Analysis | RMG 380 | Nomination Ref. Number |
|---|---|---|
| Density @ 15°C / API @ 60°F | 0.9910 | |
| Viscosity cSt - 50°C | 288 | OWBUC14TS0003 |
| Sulfur % (m/m) | 2.64 | **Date of Commencement of Delivery** |
| Water % (v/v) | 0.05 | |
| Flashpoint PM X F° | 167° | 16 OCT 2014 |

**Delivery Method:** ☐ Shore Tank  ☑ Barge  ☐ Tank Truck    UTB

| Product | Barge Name | Alongside Vessel | | Connection Made | | Started Discharging | | Finished Discharging | | Hoses Off | | Departed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date |
| RMG 380 | INVESTIGATOR | 1945 | 16Oct14 | 2035 | 16Oct14 | 2055 | 16Oct14 | 0005 | 17Oct14 | 0015 | 17Oct14 | 0030 | 17Oct14 |

| Shore Tank or Barge Tank | Product Name | Opening | | | Closing | | | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| | | MT/FT CM/IN | Quantity | Temp °C / °F | MT/FT CM/IN | Quantity | Temp °C / °F | |
| 3P | RMG 380 | 5-7¼ | 1453.88 | 125° | 14-6¾ | 15.53 | 60° | |
| 3S | | 5-3 | 1487.85 | | 14-6¾ | 15.56 | | |
| 4S | | 5-10¾ | 1411.63 | | 14-7 | 15.57 | | 4306.20 |
| | | | 4352.56 | | | 46.66 | | |

| Product Description | Gross Quantity (Units) | Temp. °C / °F | Temperature Correction Factor | Billing Quantities | | | |
|---|---|---|---|---|---|---|---|
| | | | | Barrels / Liters Net @15°C / 60°F | Vol. to Weight Conversion Factor | Metric Tons Net | |
| Fuel Oil RMG380 | 4306.20 | 125° | .15721 | 4199.40 | .9752 | 660.18 MT | |
| Fuel Oil      cSt | | | | | | | |
| Marine Diesel | | | | | | | |
| Gas Oil | | | | | | | |

Samples were taken, sealed and distributed as follows:

Vessel Sample #'s  S-1193758

Supplier Sample #'s  B1-1193757, B2-114 7281

Surveyor Sample #'s (if required) _____

Marpol Sample #'s  SM-193810

Others (if required) _____

I confirm that the above product was delivered, appropriate samples have been received and that the quantity supplied was witnessed as correct.

Signature. _Mario S. Sing_
Master (2nd/Engineer)

Print Name: _MARIO SING_
(Block Letters)

Vessel Stamp:

The fuel oil supplied is in conformity with regulations 14 (1) or (4) (a) and regulation 18 (1) of Annex VI to MARPOL 73/78.

**Chevron Marine Products LLC**

Name, Address and Telephone of Supplier: 6001 Bollinger Cyn RD Bldg 1, 3rd Floor
San Ramon, CA 94583  (925) 842-3796

Signature of Supplier's Representative. _____

Print Name (Block Letters)  KELLY LINDBLOM

Supplier's gauges and sampling witnessed by customer's representative.

Yes / Declined

Was a note of protest issued?

Yes / No

Remarks     MSDS DELIVERED TO VESSEL

R-264 (7-10)

# EXHIBIT 3



M/V  GLOBAL PHOENIX
AND OR OWNERS CHARTERERS

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111  2nd Avenue South
Saskatoon, Saskatchewan, CA-S7K 3R7
CanadaT
Timur Rudnitskiy

PORT:  PORTLAND(OR USA)
YOUR REFERENCE:

| | |
|---|---|
| DATE OF INVOICE  : | 16. October 2014 |
| INVOICE NO          : | 24-30906 |
| ORDER NO.           : | 24-29015 |
| DATE OF SUPPLY    : | 16. October 2014 |
| DUE DATE            : | 15. November 2014 |

| Quantity supplied | Quality description | Price per | Invoice amount |
|---|---|---|---|
| 1,000  LPS | Environmental fee | 60,00  LPS | 60,00 |
| 660,180  MT | Fueloil 380-CST 3,5% | 622,00  MT | 410,631,96 |

| | | | |
|---|---|---|---|
| Your VAT No. | | VAT Amount      USD | 0,00 |
| Our VAT No      GB 727 4450 31 | | Total                 USD | 410,691,96 |

The prices are excl. all taxes and or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday  In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions.

| | | |
|---|---|---|
| **BANK:** | ING Bank N.V | **OW BUNKERS (UK) LIMITED** |
| | | Pilgrim House |
| | | William Street |
| **ACCOUNT:** | IBAN: NL26 INGB 0020 1180 31 | GB-SL4 1BA Windsor Berkshire |
| | IBAN: NL10 INGB 0651 3696 81 | |
| | | Phone +44 1753 483300 |
| | SWIFT: INGBNL2A | Fax   +44 1753 483310 |

USD and all other currencies
EUR

E-mail: owbunkersuk@owbunker.com

# EXHIBIT 4

# OW BUNKERS (UK) LTD.
# OWB UK RS

**(W) Bunker**

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111 2nd Avenue South
CA-S7K 3R7 Saskatoon, Saskatchewan
Canada
Timur Rudnitskiy

First Floor, Pilgrim House
2-6 William Street
Windsor, Berkshire SL4 1BA
Great Britain
Phone +44 1753 483300
Fax    +44 1753 483310
E-mail owbunkersuk@owbunker com
Internet http www owbunker com
Reg No  3978855
ING Bank N V
IBAN  NL26 INGB 0020 1180 31
IBAN  NL10 INGB 0651 3696 81
SWIFT  INGBNL2A
IBAN  NL26 INGB 0020 1180 31
SWIFT  INGBNL2A

London   14  October 2014

## Sales Order Confirmation

**Sales Order No.**     **24-29076**

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | CMB GIULIA (IMO  9588419) |
| Port | PORTLAND(OR USA) |
| Delivery date | Between 17  October 2014 and 20  October 2014 |
| Seller | OW BUNKERS (UK) LIMITED |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV CMB GIULIA AND/OR CANPOTEX SHIPPING SERVICES LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 1 00 | LPS | Surcharge | USD | 60 00 | LPS | Chevron |
| 464 00 | MT | Fueloil 380-CST 3 5% | USD | 617 00 | MT | Chevron Delivery  Barge |
| 100 00 | MT | 380-CST 1% | USD | 826 00 | MT | Chevron Delivery  Barge |

| | |
|---|---|
| Agent | |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 |

We thank you for this nomination.

Kind Regards

Anders Stom

| | |
|---|---|
| Direct | +44 17 5348 3304 |
| Mobile | +44 78 1398 9156 |
| Yahoo ID | anst_owbunker |
| E-Mail | anst@owbunker com |
| Office E-Mail | owbunkersuk@owbunker com |

# OW BUNKERS (UK) LTD.
# OWB UK RS



TERMS AND CONDITIONS.
--------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to OW BUNKERS (UK) LIMITED as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**OW BUNKERS (UK) LTD.**
**OWB UK RS**

 **Bunker**

GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

**BEFORE BUNKERING**

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks) Compare measurements and verify the quantities as per barge ullage tables When in full agreement please sign the ullage/sounding report for Before Supply figures If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

**DURING BUNKERING**

Always place a watchman to witness safe operation including also proper and correct sampling  The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling  Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples  Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes  All seal numbers to be inserted into the Bunker Delivery Receipt (BDR)  The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air  is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties  If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain  the time (hours from/to) that airblow was notified

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply  Pay special attention hereto and take all necessary precautions to observe, which includes
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
- Agree with the barge when and if they are going to make stripping of their tanks
- Check and note the draft fore, mid and aft on the barge before and after supply to compare
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master

**AFTER COMPLETION**

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank  Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor  If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply

**QUANTITY COMPLAINTS**

# EXHIBIT 5


**Chevron**

## Bunker Delivery Note

| | |
|---|---|
| Port/Delivery Location | IMO Number of Receiving Vessel |
| Bunkers Delivered to M/V or S/S | Vessel Flag | Next Port of Call |
| Owner/Operator or Account of | Ship's Agent | Voyage Destination |
| Loading Terminal | Contracting Company | |

| Product Analysis | | | Nomination Ref. Number |
|---|---|---|---|
| Density @ 15°C / API @60°F | | | |
| Viscosity cSt - 50°C | | | |
| Sulfur % (m/m) | | | **Date of Commencement of Delivery** |
| Water % (v/v) | | | |
| Flashpoint PM °C | | | |

**Delivery Method:** ☐ Shore Tank   ☒ Barge   ☐ Tank Truck

| Product | Barge Name | Alongside Vessel | | Connection Made | | Started Discharging | | Finished Discharging | | Hoses Off | | Departed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| Shore Tank or Barge Tank | Product Name | Opening | | Temp. °C / °F | Closing | | Temp. °C / °F | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| | | MT/FT CM/IN | Quantity | | MT/FT CM/IN | Quantity | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Product Description | Gross Quantity (Units) | Temp. °C / °F | Temperature Correction Factor | Billing Quantities | | Metric Tons Net |
|---|---|---|---|---|---|---|
| | | | | Barrels / Liters Net @15°C / 60°F | Vol. to Weight Conversion Factor | |
| Fuel Oil . . . . . . . . . cSt | | | | | | |
| Fuel Oil . . . . . . . . . cSt | | | | | | |
| Marine Diesel | | | | | | |
| Gas Oil | | | | | | |

Samples were taken, sealed and distributed as follows:

Vessel Sample #'s _____

Supplier Sample #'s _____

Surveyor Sample #'s (if required)_____

Marpol Sample #'s _____

Others (if required) _____

I confirm that the above product was delivered, appropriate samples have been received and that the quantity supplied was witnessed as correct.

Signature: _____
(Master/Chief Engineer)

Print Name: _____
(Block Letters)

Vessel Stamp:

Supplier's gauges and sampling witnessed by customer's representative:
Yes / Declined

Was a note of protest issued?   Yes / No

The fuel oil supplied is in conformity with regulations 14 (1) or (4) (a) and regulation 18 (1) of annex VI to MARPOL 73/78

Name, Address and Telephone of Supplier:   **Chevron Marine Products LLC**
**6001 Bollinger Cyn RD Bldg 1, 3rd Floor**

Signature of Supplier's Representative: _____   **San Ramon, CA 94583 (925) 842-3796**

Print Name (Block Letters): _____

Remarks:

*This product meets a 1% sulfur specification. It is not intended for use as ECA Marine Fuel per 40 CFR § 80.511(b)(9)*

R-264 (7-10)

# **EXHIBIT 6**



**Bunker**

M/V  CMB GIULIA
AND OR OWNERS CHARTERERS

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111  2nd Avenue South
Saskatoon, Saskatchewan, CA-S7K 3R7
CanadaT
Timur Rudnitskiy

| | | |
|---|---|---|
| DATE OF INVOICE | : | 20. October 2014 |
| INVOICE NO | : | 24-30907 |
| ORDER NO. | : | 24-29076 |
| DATE OF SUPPLY | : | 20. October 2014 |

PORT:  PORTLAND(OR USA)
YOUR REFERENCE:

DUE DATE        :  19. November 2014

| Quantity supplied | Quality description | Price per | Invoice amount |
|---|---|---|---|
| 1,000  LPS | Envioronmental Fee | 60,00  LPS | 60,00 |
| 464,940  MT | Fueloil 380-CST 3,5% | 617,00  MT | 286.867,98 |
| 100,110  MT | 380-CST 1% | 826,00  MT | 82.690,86 |

| | | | |
|---|---|---|---|
| Your VAT No. | | VAT Amount | USD | 0,00 |
| Our VAT No. | GB 727 4450 31 | Total | USD | 369.618,84 |

The prices are excl. all taxes and or other fees.

**TERMS OF PAYMENT** 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | |
|---|---|---|
| BANK: | ING Bank N.V | |
| ACCOUNT: | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies |
| | IBAN: NL10 INGB 0651 3696 81 | EUR |
| | SWIFT: INGBNL2A | |

OW BUNKERS (UK) LIMITED
Pilgrim House
William Street
GB SL4 1BA Windsor Berkshire

Phone +44 1753 483300
Fax    +44 1753 483310

E-mail: owbunkersuk@ow-b.el or eng

# EXHIBIT 7

# OW BUNKERS (UK) LTD.
# OWB UK RS

 **Bunker**

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400  111  2nd Avenue South
CA-S7K 3R7 Saskatoon  Saskatchewan
Canada
Timur Rudnitskiy

First Floor  Pilgrim House
2-6 William Street
Windsor  Berkshire SL4 1BA
Great Britain
Phone  +44 1753 483300
Fax     +44 1753 483310
E-mail  owbunkersuk@owbunker com
Internet  http www owbunker com
Reg No   3978855
ING Bank N V
IBAN  NL26 INGB 0020 1180 31
IBAN  NL10 INGB 0651 3696 81
SWIFT  INGBNL2A
IBAN  NL26 INGB 0020 1180 31
SWIFT  INGBNL2A

# Sales Order Confirmation

London   17  October 2014

| Sales Order No | **24-29094** |
|---|---|

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| **Vessel** | ASTON TRADER II (IMO  9392731) |
| **Port** | PORTLAND(OR USA) |
| **Delivery date** | Between 22  October 2014 and 27  October 2014 |
| **Seller** | OW BUNKERS (UK) LIMITED |
| **Your ref** | |
| **Account** | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV ASTON TRADER II AND/OR CANPOTEX SHIPPING SERVICES LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 550 00 | MT | Fueloil 380 CST 3 5% | USD | 603 00 | MT | Chevron Delivery  Barge |

| | |
|---|---|
| **Agent** | |
| **Payment** | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| **Remarks** | ISO 8217 2005 |

We thank you for this nomination

Kind Regards

Anders Stom

| | |
|---|---|
| **Direct** | +44 17 5348 3304 |
| **Mobile** | +44 78 1398 9156 |
| **Yahoo ID** | anst_owbunker |
| **E-Mail** | anst@owbunker com |
| **Office E-Mail** | owbunkersuk@owbunker com |

**OW BUNKERS (UK) LTD.**
**OWB UK RS**



TERMS AND CONDITIONS.
-------------------------------------------

**SAMPLES:**

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

**TERMS:**

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to OW BUNKERS (UK) LIMITED as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

**GUIDELINES FOR RECEIVING BUNKERS:**

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

**OTHERWISE:**

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**OW BUNKERS (UK) LTD.**
**OWB UK RS**

 **Bunker**

GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

**BEFORE BUNKERING:**

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

**DURING BUNKERING:**

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

**AFTER COMPLETION:**

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

**QUANTITY COMPLAINTS:**

**EXHIBIT 8**

**Chevron**

## Bunker Delivery Note

| Port/Delivery Location | | IMO Number of Receiving Vessel | |
|---|---|---|---|
| Bunkers Delivered to M/V or S/S | Vessel Flag | Next Port of Call | |
| Owner/Operator or Account of | Ship's Agent | Voyage Destination | |
| Loading Terminal | | Contracting Company | |

| Product Analysis | | | | Nomination Ref Number |
|---|---|---|---|---|
| Density @ 15°C / API @60°F | | | | |
| Viscosity cSt   50°C | | | | |
| Sulfur % (m/m) | | | | Date of Commencement of Delivery |
| Water % (v/v) | | | | |
| Flashpoint PM °C | | | | |

| Delivery Method | ☐ Shore Tank | ☐ Barge | ☐ Tank Truck | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | Alongside Vessel | | Connection Made | | Started Discharging | | Finished Discharging | | Hoses Off | | Departed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product | Barge Name | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| Shore Tank or Barge Tank | Product Name | Opening | | Temp °C / °F | Closing | | Temp °C / °F | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| | | MT/FT CM/IN | Quantity | | MT/FT CM/IN | Quantity | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Product Description | | Gross Quantity (Units) | Temp °C / °F | Temperature Correction Factor | Billing Quantities | | |
|---|---|---|---|---|---|---|---|
| | | | | | Barrels / Liters Net @15°C / 60°F | Vol to Weight Conversion Factor | Metric Tons Net |
| Fuel Oil | cSt | | | | | | |
| Fuel Oil | cSt | | | | | | |
| Marine Diesel | | | | | | | |
| Gas Oil | | | | | | | |

Samples were taken sealed and distributed as follows

Vessel Sample #'s _____

Supplier Sample #'s _____

Surveyor Sample #'s (if required) _____

Marpol Sample #'s _____

Others (if required) _____

I confirm that the above product was delivered appropriate samples have been received and that the quantity supplied was witnessed as correct

Signature _____
                                (Master/ Chief Engineer)

Print Name _____
                                (Block Letters)

Vessel Stamp

M/V "ASTON TRADER II"

The fuel oil supplied is in conformity with regulations 14 (1) or (4) (a) and regulation 18 (1) of annex VI to MARPOL 73/78

Name Address and Telephone of Supplier

Signature of Supplier's Representative

Print Name (Block Letters) _____

Supplier's gauges and sampling witnessed by customer's representative
                                                Yes / Declined

Was a note of protest issued?
                                                Yes / No

Remarks

R 264 (7 10)

# **EXHIBIT 9**

Final Version 14.02.2014

# GENERAL TERMS FOR FIXED PRICE TRADING

BETWEEN

O.W. Supply & Trading A/S
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
(the "Seller")

AND

Canpotex Shipping Services Limited
24-725-4931
P O  Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, SK  S7K 3R7
(the "Buyer")

( each a "**Party**" in the singular and the "**Parties**" in the plural)

Dated     February 14th 2014 (the "**Effective Date**")

**INDEX**

PART I – FIXED PRICE TERMS                                      3

1    General                                                   3

2    Effectiveness of these Terms                              4

3    Delivery                                                  4

4    Payment                                                   5

5    Assignment                                                7

6    Confidentiality                                           7

7    Failure to take delivery                                  7

8    Termination for cause (breach)                            8

9    Conditions Precedent                                      11

10      Expenses                                               11

11      Force Majeure                                          11

12      Notices                                                12

13      Entire agreement                                       13

14      Law and jurisdiction                                   14

15      Definitions                                            14

16      Signature                                              16

## PART I – FIXED PRICE TERMS

1.      **General**

1.1     The Buyer and the Seller have entered and/or anticipate entering into one or more transactions (each a **Transaction**) that are or will be governed by these General Terms for Fixed Price Trading (the **Terms**), which include (i) the documents and other confirmation evidence in the form set out in Schedule 1 (each a **Confirmation**) exchanged between the parties confirming those Transactions, (ii) Schedule 2 (*Credit Support Annex*), pursuant to which margin may be required to be delivered by the Buyer to cover the Seller's exposure to the Buyer, and (iii) Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*).

1.2     A Transaction may be entered into and/or modified orally (including by telephone) and/or in writing by letter, facsimile and/or electronic data transfer.

1.3     As soon as practicable after the entering into a Transaction the Parties will exchange and execute a Confirmation setting out the agreed terms of such Transaction. The failure to prepare and/or execute a Confirmation shall not affect the validity of a Transaction.

1.4     Under each Confirmation the Seller agrees to sell and deliver, and the Buyer agrees to buy and take delivery of the relevant products specified therein at the price set out in the relevant Confirmation.

1.5     In the event of any inconsistency between the provisions of any Confirmation, Schedule 2 (*Credit Support Annex*), Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*) and the other provisions of these Terms, the documents will prevail in the following order: (i) any Confirmation; (ii) these Terms; (iii) Schedule 2 (*Credit Support Annex*); and (iv) Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*).

1.6     The Buyer acknowledges that each Transaction under these Terms has been entered into for the purpose of receipt and delivery in accordance with the Buyer's own expected usage requirements.

2.        **Effectiveness of these Terms**

2.1       These Terms shall come into effect on the Effective Date and shall remain in effect for a term of five (5) years thereafter.

2.2       These Terms will automatically renew for consecutive two (2) years unless terminated by either Party upon prior thereto giving one-hundred eighty (180) days' prior written notice to the other Party.

2.3       For the avoidance of doubt, neither Party shall be under any obligation to enter into any Transaction hereunder simply because of the existence and effectiveness of these Terms.

3.        **Delivery**

3.1       Following delivery of a Receipt from the Seller, the Seller shall, subject to section 3.6 below, be obliged (either itself, through an Affiliate of the Seller or through any other supplier delivering on the Seller's behalf) to deliver, and the Buyer (or, if specified in the Nomination, the Buyer's Affiliate) shall be obliged to take delivery of, the total volume specified in the Nomination at the port specified in the Nomination, provided that if the Buyer has specified a port for delivery which is different from the Base Port in the Nomination, the Seller may, in its sole discretion, refuse to deliver a Receipt in respect of such Nomination.

3.2       The Buyer shall, in the last month of the Delivery Period, take delivery of the remaining Total Volume.

3.3       The Seller (or any Affiliate or supplier acting on behalf of the Seller) shall inform the Buyer (or the agent specified by the Buyer) of the exact time and date for delivery.

3.4       If the delivery is made to any Affiliate of the Buyer, the Buyer shall remain liable as principal obligor of the obligations of such Affiliate and the Seller shall be entitled to arrest, levy execution on and subsequently sell the vessel which has taken the delivery irrespective of whether such vessel belongs to the Buyer or any Affiliate of the Buyer.

3.5     Delivery shall take place in accordance with the terms set out in Schedule 3 (Terms and conditions of sale for Marine Bunkers).

3.6     If the total volume specified in the Nomination is not available in the port specified in the Nomination, the Seller shall use its best endeavours to deliver replacement products, provided that any such failure to deliver the total volume specified in the Nomination shall not constitute a breach of the Seller's obligations under these Terms and the Seller shall have no liability to the Buyer or any other party under these Terms as a result of such failure to deliver.

4.      **Payment**

4.1     With respect to each Transaction where delivery is in the Base Port, the Buyer owes to the Seller on the date of delivery an amount equal to the sum of (i) the Price multiplied by the requested volume; and (ii) any Related Delivery Costs.

4.2     With respect to each Transaction where the Seller agrees, in accordance with section 3.1 and following an Other Port Nomination Notice from the Buyer, that delivery shall be in a port other than the Base Port, the Buyer shall pay the Seller an amount equal to the sum of: (i) the Price multiplied by the requested volume(s); (ii) any Related Delivery Costs; (iii) the Port Differential multiplied by the requested volume(s); (iv) if the specified product(s) in relation to the Transaction are unavailable in the specified port and the Seller and Buyer agree upon the delivery of a replacement product, the Product Differential multiplied by the requested volume(s); and (v) Other Port Costs.

For the purposes of this section 4.2:

> **Other Port Costs** means all costs and expenses (including but not limited to any taxes) incurred by the Seller as a consequence of the Buyer's nomination of delivery in a port other than the Base Port, as calculated by the Seller acting in good faith and in a commercially reasonable manner.

> **Port Differential** means a price differential expressed as an amount (which may be positive or negative), as calculated by the Seller acting in good faith and in a commercially reasonable manner, between the Base Port and the specified port based on (i) the date of the Seller's agreement

with the supplier(s) which is/are to deliver the nominated volume in the other port; (ii) the price listed for the specified product(s) in relation to the Transaction in the Base Port Index on such date; and (iii) the price listed for the specified product(s) in relation to the Transaction and port in the Marine Fuel Price Index on such date, or if the Marine Fuel Price Index does not contain any prices for the port specified in the nomination, the actual price obtained from the supplier.

**Product Differential** means a price differential expressed as an amount (which may be positive or negative), as calculated by the Seller acting in good faith and in a commercially reasonable manner, between the product(s) in relation to the Transaction and any replacement products based on (i) the date of the Seller's agreement with the supplier(s) which is/are to deliver the replacement product(s) in the other port; (ii) the price listed for the relevant product(s) in the Base Port Index on such date; and (iii) the price listed for the relevant replacement product(s) and port in the Marine Fuel Price Index on such date, or if the Marine Fuel Price Index does not contain any prices for the replacement product(s) agreed upon between the Parties the actual price obtained from the supplier in relation to such product(s).

The total amount payable under this section 4 shall become due and payable on the date of delivery, or, if the Buyer has not been notified about the amount of the payment obligation, on the date the Buyer receives such notification. The Buyer shall satisfy its obligation to pay such amount by either (i) having an amount deducted from its available credit lines with the Seller (if any, made available by the Seller to the Buyer from time to time in relation to Transactions under these Terms), or (ii) paying an amount to the Seller on the date of delivery, provided that it will be possible for the Buyer to satisfy its obligation under this clause by a combination of (i) and (ii) above.

4.3     Any payment made pursuant to these Terms shall be made without any deduction, set-off or counterclaim. If the Buyer is required by law to make any deduction or withholding for tax from any payment to be made pursuant to these Terms, the amount due shall be increased to the extent necessary to ensure that the Seller receives the full amount due notwithstanding any such

deduction or withholding, unless such deduction or withholding of tax would not have been imposed in respect of the payment but for a connection between the jurisdiction of the taxation authority imposing such tax and the Seller.

4.4    All payments shall be made in USD unless the Parties agree otherwise in writing.

4.5    If the Buyer fails to make any payment in accordance with this section 4, interest shall accrue (before as well as after judgment) on the overdue amount for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Overdue Payment Interest Rate. Any such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

5.    **Assignment**

5.1    A Party may not assign or transfer any of its rights and/or obligations under these Terms to any third party without the prior written consent of the other Party, except: (i) to an Affiliate; or (ii) a Party may transfer all or any part of its interest in any Early Termination Amount payable to it by a breaching Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest.

6.    **Confidentiality**

6.1    The Parties shall keep all matters in relation to these Terms confidential including, but not limited to, the existence of these Terms. The aforesaid shall, however, not prevent the Parties from disclosing information: (i) when required by law; (ii) when part of obtaining advice from external advisors subjected to an obligation of confidentiality; or (iii) when part of communications between a Party and its Affiliates.

6.2    The above section 6.1 shall continue to apply after the expiry of these Terms irrespective of the reason for such expiration.

7.    **Failure to take delivery**

7.1     If the Buyer fails to: (i) take delivery of any volume nominated in accordance with these Terms at the agreed date and time; or (ii) take delivery, unless otherwise agreed, of the total volume nominated in respect of a Transaction during the then current month, such volume not delivered (the **Undelivered Volume**) shall be cash settled in accordance with this section 6.

7.2     The **Cash Settlement Amount** shall be calculated as the Undelivered Volume multiplied by the **Price Differential**.  The Price Differential shall be an amount equal to (i) the price for the specified product(s) in relation to the Transaction listed in the Base Port Index for the Base Port (a) in respect of section 7.1 (i), at a date between the delivery date and the second Business Day thereafter (both days included) chosen by the Seller in its sole discretion and (b) in respect of section 7.1(ii), at a date between the last day of the relevant month and the second Business Day thereafter (both days included) chosen by the Seller in its sole discretion, minus the Price for the specified product(s) in relation to the Transaction or the quoted price where the Buyer has accepted such a price in relation to any given volume.  If the Cash Settlement Amount is a positive number the Seller shall pay such amount to the Buyer.  If the Cash Settlement Amount is a negative number the Buyer shall pay the absolute value of such amount to the Seller.

7.3     In addition, the Buyer shall pay any other direct losses or costs (**Other Costs**) that have been incurred by the Seller as determined by the Seller acting in good faith and in a commercially reasonable manner not included in the definition of Cash Settlement Amount (such as, but not limited to, hedging costs or loss of profit) as a consequence of its failure to take delivery.

7.4     On or as soon as reasonably practicable following the date of the calculation of the Cash Settlement Amount in accordance with section 7.2, the Seller shall notify the Buyer in writing of the Cash Settlement Amount and any amounts due from the Buyer under section 7.3.

7.5     The Cash Settlement Amount and the Other Costs shall be paid by the Seller or the Buyer, as the case may be, no later than two (2) Business Days after the Seller provides the Buyer with the statement of the amount to be paid.

8.      **Termination for cause (breach)**

8.1    All (but not some) outstanding Transactions may be terminated for cause if a Party has committed: (i) a material breach which is not cured within five (5) Business Days after the Party in breach has received a written notice demanding remedy of such breach; or (ii) a non-material breach which is not cured within thirty (30) Business Days after the Party in breach has received a written notice demanding remedy of such breach.

8.2    Following any breach which has not been cured within the periods set out in section 8.1, the non-breaching Party may, by notice to the breaching Party, designate a day not earlier than the day such notice is effective as an early termination date (the **Early Termination Date**) in respect of all outstanding Transactions.

8.3    Without prejudice to the other provisions of these Terms, upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under these Terms in respect of any outstanding Transactions will be required to be made.

8.4    The amount, if any, payable in respect of an Early Termination Date (the **Early Termination Amount**) will be an amount equal to (i) the sum of (a) the Close-out Amount (whether positive or negative) determined by the Seller for all Transactions and (b) all Unpaid Amounts owing to the non-breaching Party less (ii) all Unpaid Amounts owing to the breaching Party.  If the Early Termination Amount is a positive number, the breaching Party will pay it to the non-breaching Party; if it is a negative number, the non-breaching Party will pay the absolute value of the Early Termination Amount to the breaching Party.

8.5    For the purposes of these Terms, **Close-out Amount** means the amount of the losses or costs of the non-breaching Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the non-breaching Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the non-breaching Party the economic equivalent of (a) the material terms of those terminated Transactions, including the payments and deliveries by the Parties under these Terms that would, but for the occurrence of the Early Termination Date, have been required after that date and (b) the option rights of the parties in respect of the terminated Transactions, provided that where

9

there are two non-breaching Parties, each Party will determine a Close-out Amount in relation to the terminated Transactions and the Close-out Amount will be the sum of one-half of the difference between the higher amount so determined and the lower amount so determined, provided that any positive amount shall be higher than any negative amount and, where two negative amounts are compared, the smaller negative number shall be higher than the larger negative number.

8.6     Without duplication of amounts calculated based on section 8.5 above, the Buyer shall  furthermore pay any other losses or costs incurred by the Seller (such as, but not limited to, hedging costs or loss of profit) as a consequence of any breach by the Buyer as determined by the Seller acting in good faith and in a commercially reasonable manner.

8.7     Any Close-out Amount will be determined by the Seller (or its agent), acting in good faith and using commercially reasonable procedures in order to produce a commercially reasonable result.  The Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

8.8     All amounts owed by a Party shall be paid on the Early Termination Date irrespective of any date of maturity and/or payment date otherwise set out in these Terms.

8.9     Any Early Termination Amount payable to one party (the **Payee**) by the other party (the **Payer**), will, at the option of the non-breaching Party (**X**) (and without prior notice to the breaching Party, as the case may be), be reduced by its set-off against any other amounts (**Other Amounts**) payable by the Payee to the Payer (whether or not arising under these Terms, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 8.9.

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in

10

which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this section 8.9 will be effective to create a charge or other security interest. This Section 8.9 will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

9.      **Conditions Precedent**

9.1     Each obligation of each Party to make any payment or delivery under these Terms is subject to the condition precedent, that no material breach or potential material breach with respect to the other Party has occurred or is continuing. For the purpose of these Terms, a potential material breach shall mean any event which by notice and/or the lapse of time, would constitute a material breach of these Terms.

10.     **Expenses**

10.1    Following a failure to take delivery of Total Volume pursuant to section 7.1, the Buyer or, following a breach pursuant to section 8, the breaching Party, will on demand indemnify and hold harmless the other Party for and against all reasonable out-of-pocket expenses, including, but not limited to legal fees, execution fees and stamp taxes, incurred by such other Party by reason of the enforcement and protection of its rights under these Terms or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

11.     **Force Majeure**

11.1    Both Parties are excused from the performance of their obligations under these Terms if a force majeure event in respect of either Party occurs and is continuing.  Such obligations shall not be extinguished but, subject to section 11.5, shall be suspended until the force majeure event is no longer continuing, when such obligations shall be required to be satisfied within five (5) business days.

11.2    The determination of whether an event should be deemed to constitute an event of force majeure shall be based on the applicable law. Notwithstanding the aforesaid the following events shall always be deemed to constitute an event of force majeure if they would prevent any delivery or payment under these Terms:

War, flood, lightning, drought, earthquake, embargo, fire, volcanic eruption, landslide, hurricane, cyclone, typhoon, tornado, explosion, civil disturbance, act of God or the public enemy, terrorist act, military action, epidemic, famine or plague, shipwreck, action of a court or public authority or restraint of princes or rulers; each on an industry wide, region-wide or nationwide basis.

11.3    Notwithstanding anything to the contrary in the previous sections of this section 11 an embargo against Iran shall always be deemed to prevent the Seller from making deliveries in the Base Port if the Base Port is in Iran or the United Arab Emirates.

11.4    A force majeure event shall be deemed to have occurred in relation to the Seller to the extent that such an event occurs in relation to the Seller's suppliers and has a material effect on the Seller's ability to perform its obligations under these Terms and that the event cannot be mitigated by the Seller by using reasonable efforts (which will not require the Seller to incur a loss, other than immaterial, incidental expenses). .

11.5    If the force majeure event continues for more than 180 days all Transactions under these Terms will be terminated under section 8 with both Parties as non-breaching Parties.

12.    **Notices**

12.1    Each Party giving or making any notice, request or demand or other communication pursuant to these Terms shall give such notice in writing to the notice details of the other Party listed below and use one of the following methods of delivery, each of which for the purposes of these Terms is in writing and will be deemed effective as indicated:

**O.W. Supply & Trading A/S**
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
Att.: Risk Management
Email: hedging@owbunker.com
Facsimile: + 45 70 26 52 77

**Canpotex Shipping Services Limited**
24-725-4931
P.O. Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, SK  S7K 3R7
Attn: Senior Vice President, Operations
Email: scott.rudderham@canpotex.com
Facsimile: 306.653.5505

(i)     if delivered by hand, on the date it is delivered;

(ii)    if sent by registered or certified mail (in each case, return receipt requested and postage paid), on the date it is delivered or its delivery is attempted;

(iii)   if sent by nationally recognised overnight courier (with all fees paid), on the date it is delivered or its delivery is attempted;

(iv)    if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); or

(v)     if sent by e-mail, on the date it is received.

13.     **Entire agreement**

13.1      These Terms, the Terms and Conditions for Marine Bunkers and the Annex constitute the entire agreement and understanding of the Parties with respect to its subject matter. Each of the Parties acknowledges that in entering into these Terms it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in these Terms) and waives all rights and remedies which might otherwise be available to it in respect thereof.

14.      **Law and jurisdiction**

14.1      These Terms, and any non-contractual obligations arising in connection with these Terms, will be governed and construed in accordance with English law.

14.2      Any dispute arising in connection with these Terms or any agreement relating hereto (including any dispute arising in relation to the Credit Support Annex and/or the Terms and Conditions of sale for Marine Bunkers) shall be finally settled under the rules of the London Maritime Arbitrators Association by one or more arbitrators appointed in accordance with such rules. The site of arbitration shall be London and the Arbitration award pronounced thereby will be final, conclusive and binding on both the parties hereto.

15.      **Definitions**

15.1      As used in these Terms:

     *Affiliate* in relation to a Party means any corporation, partnership or other entity or association that directly or indirectly through one or more intermediaries own or control or is controlled by or is under common control with that Party;

     *Base Port Nomination Notice* has the meaning set out in the relevant Confirmation;

     *Basis Volume* means, in respect of each product in relation to a Transaction, the basis volume as specified in the Confirmation;

**Business Day** means: (a) for payments any day on which banks are open for general commercial business in the city where such payment is to be made; and (b) for deliveries any day on which the relevant Port is open for general business;

**month** means a calendar month;

**Monthly Volume** means the sum of (i) the Basis Volume of the calendar month subject to any Volume Deviance invoked by the Buyer in respect of that calendar month and (ii) the Volume Deviance (if any) of the previous calendar month;

**Nomination** means an irrevocable nomination sent by the Buyer to the Seller by fax or e-mail specifying: (i) Transaction(s); (ii) volume(s); (iii) delivery date; (iv) vessel name; (v) agent; (vi) delivery port; and (vii) details of the Buyer's Affiliate (if any) taking delivery.

**Other Port Nomination Notice** has the meaning set out in the relevant Confirmation;

**Overdue Payment Interest Rate** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum, or such other rate as set out in the relevant Confirmation;

**Receipt** means a copy of the Nomination returned by the Seller in its sole discretion to the Buyer as confirmation and acceptance of the terms set out in the Nomination.

**Related Delivery Costs** means delivery costs and charges including, but not limited to, any barging, overtime, tugs and/or pipeline charges, provided that the Seller will use reasonable efforts to reduce such costs and charges to the extent that such costs and charges are deemed to be negotiable;

**Unpaid Amounts** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all terminated Transactions, the amounts that became payable (or that would have become payable but for section 9) to such party on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each terminated Transaction, for

15

each obligation which was required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other compensation in respect of that obligation or deferred obligation, as the case may be. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the Seller;

**USD** means the lawful currency of the United States of America; and

**Volume Deviance** means an increase or decrease of the Monthly Volume not exceeding 5% of such Monthly Volume following notice of such deviance from the Buyer to the Seller

**Signature**

15.2    IN WITNESS whereof, the Parties have agreed to these terms executed as at the Effective Date.

For the Seller: Ø.W. Supply & Trading A/S
Signature: _____
Print Name; Jane Dahl Christensen
Capacity:  EVP


For the Buyer: Canpotex Shipping Services Limited


Signature: _____
Print Name: Scott E. Rudderham
Capacity:   Senior Vice President, Operations


Signature: _____
Print Name: Ted J. Nieman
Capacity: Senior Vice President, General Counsel and Secretary

16

**SCHEDULE 1**

**Form of Confirmation**

The purpose of this letter (the "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below.

This Confirmation constitutes a **Confirmation** as referred to in, and supplements, forms part of and is subject to, the General Terms for Fixed Price Trading dated as of February 14th 2014, (the **Terms**) between Canpotex Shipping Services Limited (the **Buyer**) and O.W. Supply & Trading A/S (the **Seller**).   All provisions contained in the Terms govern this Confirmation except as expressly modified below.

| | |
|---|---|
| Product(s) | Product 1: [insert]; and<br>Product 2: [insert]; and<br>Product 3: [insert]. |
| Total Volume | [insert] m.t. of Product 1; and<br>[insert] m.t. of Product 2; and<br>[insert] m.t. of Product 3.<br>The abbreviation "m.t." stands for metric tonnes |
| Basis Volume per month | [insert] m.t. of Product 1; and<br>[insert] m.t. of Product 2; and<br>[insert] m.t. of Product 3. |
| Price | USD [insert] per m.t. of Product 1; and<br>USD [insert] per m.t. of Product 2; and<br>USD [insert] per m.t. of Product 3. |
| Delivery Period | from [ ] to and including [ ] |
| Base Port | [ ] |
| Minimum Volume per delivery | [ ] m.t. |
| Maximum Volume per delivery | [ ] m.t. |
| Base Port Nomination Notice | [ ] days |
| Other Port Nomination Notice | [ ] days |
| Marine Fuel Price Index | [ ] |
| Base Port Index | [ ] |

17

| Payment Term | [ ] days |
| --- | --- |
| | *The Payment Term is granted only to the extent that the Buyer's total outstanding debts at any given time are below the credit line. The latter is determined by the Seller and may at any given time be changed by the Seller in its sole discretion in accordance with the General Terms for Fixed Price Trading.* |
| Overdue  Payment  Interest Rate | [ ] |
| General Terms for Marine Fuel Delivery | [ ] |

Please confirm that the above correctly sets out the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning to us or by sending to us a letter substantially similar to this letter, which letter sets out the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms

Yours sincerely

For the Seller:

Signature:  _____

Print Name:   [insert]
Capacity:   [insert]

Confirmed as of the dated first above written:

For the Buyer:

Signature:  _____

Print Name. [insert]
Capacity:   [insert]

Final 05.02.14

# SCHEDULE 2
# CREDIT SUPPORT ANNEX

BETWEEN

O W  Supply & Trading A/S
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
Att  Risk Management
(the "**OW**")

AND

Canpotex Shipping Services Limited
24-725-4931
P O  Box 1600
Suite 400  11 2nd Avenue South
Saskatoon  SK S7K 3R7
Att  Scott E  Rudderham  Senior Vice President  Operations
(the "**Counterparty**")

(each a "**Party**" in the singular and the "**Parties**" in the plural)

2

**INDEX**

1.    BACKGROUND ............................................................................ 3

2.    THRESHOLD AND ELIGIBLE CREDIT SUPPORT ....................... 3

3.    MARGIN CALLS – EXPOSURE ............................................... 4

4.    TRANSFERS ........................................................................... 5

5.    INTEREST AMOUNT ............................................................... 6

6.    NOTICES ............................................................................... 7

7.    DEFAULT ............................................................................... 7

1.      **BACKGROUND**

1.1     OW and the Counterparty have entered and/or may enter into one or more fixed price agreements regarding the delivery of marine fuel at a fixed price, which transactions ("**Transactions**") shall be governed by the General Terms for Fixed Price Trading ("**GT for Fixed Price**") entered into between the Parties on or about the date of this Credit Support Annex (this "**Annex**").

1.2     This Annex supplements, forms part of and is subject to GT for Fixed Price and for purposes of the GT for Fixed Price.

2.      **THRESHOLD AND ELIGIBLE CREDIT SUPPORT**

2.1     For purposes of Clause 3 "**Threshold**" means:

        - with respect to Counterparty: USD 1,000,000

        - with respect to OW: USD 1,000,000

        The Threshold applies to the total amount of unsecured exposure (as defined in Clause 3.4 below) granted to the Counterparty under all agreements which this Annex supplements, forms part of and is subjected to. Thus multiple references to the Annex in different, independent agreements do not grant the Counterparty multiple Thresholds.

        "Minimum Transfer Amount" means

        -       USD 200,000

        The Threshold and the Minimum Transfer Amount for each of the Parties are agreed on the basis of an evaluation of the creditworthiness of the Parties at the time of execution of this Annex. If a Party ("**X**") at any time on the basis of a renewed evaluation of the creditworthiness of the other Party ("**Y**") deems it necessary in its sole discretion to reduce the Threshold and/or the Minimum Transfer Amount of Y, X shall be entitled to do so upon written notice to Y with immediate and retrospective effect in relation to Transactions already entered into as well as with immediate and prospective effect in relation to any future Transactions entered into. The Threshold and/or the Minimum Transfer Amount, as applicable, of X shall be subject to the same reduction(s) as the reduction(s) imposed on Y.

2.2     For purposes of Clause 3

"**Eligible Credit Support**" means with respect to Counterparty and OW:

-       Cash in USD

and "**Equivalent Credit Support**" means, in relation to any Eligible Credit Support, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

## 3.     MARGIN CALLS – EXPOSURE

3.1     If at any time the Exposure (as defined below) of a Party (the "Transferee") under the Transactions (less any value already held as Credit Support by the Transferee pursuant to this Clause 3) exceeds the Threshold for such Party (such excess amount referred to as the "**Excess Amount**"), the Transferee shall be entitled to demand by written notice (i.e. a margin call), that the other Party (the "Transferor") transfers to it Eligible Credit Support with a value equal to the Excess Amount (the "**Delivery Amount**") as credit support (the "**Credit Support**"). If the value of the Credit Support held by the Transferee pursuant to this Clause 3 at any time exceeds the Excess Amount, the Transferor may demand by written notice to the Transferee that the Transferee transfers to it Equivalent Credit Support with a value equal to the excess Credit Support (the "**Return Amount**"). If at any time, the Exposure of the Transferee is reduced to less than the Threshold for such Party, the Transferor may demand by written notice that the Transferee transfers Equivalent Credit Support equal to the value held as Credit Support pursuant to this Clause 3 (in which case the provision below on minimum transfer amount shall not apply).

3.2     A demand pursuant to Clause 3.1 shall be made no later than at 1pm (CET) on a business day to be deemed received on such date; otherwise it will be deemed received on the following business day.

3.3     The Delivery Amounts and the Return Amounts will be rounded up or down, as applicable, to the nearest USD $5,000. The Parties agree that demands for Delivery Amounts and Return Amounts may only be made if the Delivery Amounts or Return Amounts exceeds the Minimum Transfer Amount.

3.4     "**Exposure**" means with respect to a Party on any given date, the amount that would have been payable to such Party by the other Party (expressed as a positive number) less the amount, which would have been payable by that Party to the other Party (expressed as a negative number) under the Transactions if all the Transactions were

5

being terminated and cash settled on such date. Such Exposure will be calculated by OW in good faith and in a commercially reasonable manner based on mark to market values, and the Exposure may be calculated on a daily basis or as OW otherwise may deem fit in its sole discretion. All calculations and determinations shall be made in USD and are subject to review by Counterparty. Both Parties agree to use their best efforts to resolve expeditiously any disagreement concerning such calculations and determinations. If the Parties cannot agree on such calculation or determination they agree to appoint expeditiously and jointly an independent dealer in the instruments or obligations, to make such calculation or determination, with the calculation or determination made by such independent dealer to be binding and conclusive absent manifest error. Any disagreement with regards to the calculation of the Exposure cannot be invoked as a reason for withholding a demand for transfer of an amount. If it is subsequently determined by way of settlement or legal action that the calculation of the Exposure was erroneous the difference shall be transferred to the relevant Party in accordance with the terms applicable to an Excess Amount.

4.     **INITIAL MARGIN**

4.1    If the Parties have agreed at the time of entering into a Transaction that initial margin in the amount agreed between the Parties (the "**Initial Margin**") shall apply to Counterparty relating to such Transaction, Counterparty (as Transferor) shall transfer to OW (as Transferee) Eligible Credit Support with a value equal to the Initial Margin (and irrespective of the Threshold and any Exposure of OW pursuant to Clause 3) in accordance with the provisions set out in this Annex.

4.2    If the notional quantity of the Transaction for which Initial Margin has been delivered, is settled in intervals during the term of the Transaction, Counterparty is entitled to demand by written notice to OW that the Initial Margin be reduced with a proportionate part each time such settlement has taken place, and accordingly, OW shall transfer to Counterparty Equivalent Credit Support equal to the value of such proportionate decrease of the Initial Margin as calculated by OW (the "**Initial Margin Return**").

4.3    For purposes of this Annex Eligible Credit Support delivered as Initial Margin shall constitute Credit Support, except that it shall not be taken into account when calculating the Excess Amount in Clause 3.1.

5.     **TRANSFERS**

5.1    Transfers of cash as Eligible Credit Support or Equivalent Credit Support, respectively, shall be made, unless explicitly agreed otherwise, with value to the

relevant bank account of the receiving Party (i) in case of Initial Margin or payment of option premium, within two (2) business days after entering into the relevant Transaction, and (ii) in other cases, within two (2) business days after receipt by Counterparty or OW, as applicable, of the demand from the other Party requesting such transfer. The relevant bank account shall be the USD bank account notified by a Party to the other Party from time to time.

5.2     The Parties agree that all transfers of Eligible Credit Support or Equivalent Credit Support shall be transfers of title to the relevant credit support, that the recipient shall be free to use and dispose of such credit support and that nothing herein shall be deemed to create a security interest in such Eligible Credit Support or Equivalent Credit Support.

## 6.     INTEREST AMOUNT

6.1     The Transferee will in respect of the preceding calendar month transfer to the Transferor an amount in USD equal to the interest for each day of such interest period on the principal amount of the cash portion of the Credit Support, cf. Clause 3, as determined by OW by multiplying the amount of cash on that day by the interest rate, set out below in Clause 6.2, and dividing it by 365 (the "**Interest Amount**"), to the extent that OW determines that a Delivery Amount would not be created or increased by the transfer. Such transfer of accrued interest shall be made not later than on the fifth business day of each calendar month to a bank account specified by the Transferor.

6.2     For purposes of Clause 6.1 the interest rate shall be 1 mth USD LIBOR minus 0,5 pct. p.a. For the purposes hereof, "1 mth USD LIBOR" means for any day, an interest rate per annum equal to the rate published as the 1 mth USD LIBOR that appears on Reuters Code "USD1MFSR=" for such day, or as published in another source mutually agreed by the parties (however, the Interest Rate cannot be below 0%).

## 7.     NOTICES

7.1     Each Party giving or making any notice, request or demand or other communication pursuant to this Annex shall give the notice in writing and use one of the following methods of delivery, each of which for purposes of this Annex is a writing:

(i)      Personal delivery;
(ii)     Registered or Certified Mail (in each case, return receipt requested and postage paid);
(iii)    Nationally recognized overnight courier (with all fees paid);

7

(iv)    Facsimile,

(v)    E-mail

7 2    Any Party giving a notice shall address the notice to the appropriate person at the receiving party at the address listed in Clause 12 (Notices) of the GT for Fixed Price or to another addressee or another address as designated by a Party in a notice pursuant to this section

7 3    Except as provided elsewhere in this Annex, a notice is effective only if the Party giving the notice has complied with section 7 1 and section 7 2

## 7.    DEFAULT

7 1    Any breach by a Party of its obligations as set out in this Annex, if such breach is not cured within five (5) business days after notice of such breach is given to the Party, shall constitute a material breach for the purposes of the GT for Fixed Price  Any material breach shall entitle the other Party to exercise the remedies as such other Party may be entitled to under the GT for Fixed Price, the Transactions or applicable law

7 2    If an Early Termination Date (as defined in the GT for Fixed Price) is designated or deemed to occur in respect of all Transactions subject to the GT for Fixed Price an amount equal to the value of the Credit Support provided under Clause 3 a, respectively, on such Early Termination Date (including any Interest Amount(s) accrued but not transferred as at that date) as calculated by OW to a net amount, will be deemed to be an Unpaid Amount due to the relevant Transferor for purposes of the settlement provisions of the GT for Fixed Price  For purposes of this Clause the value of Credit Support will be calculated as follows  (i) with respect to cash, the face amount thereof

8

Final 05.02.14

# Schedule 3
# Terms and Conditions of sale for Marine Bunkers

A.       GENERAL INTRODUCTION

A.1      This is a statement of the terms and conditions according to which the International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2      These conditions apply to all offers, quotations, orders, agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3      General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4      In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

B.       DEFINITIONS

B.1      Throughout this document the following definitions shall apply:

|  |  |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner or Bareboat Charterer of the vessel; |

| | |
|---|---|
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |

C.        OFFERS, QUOTATIONS AND PRICES

C.1      An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the GTC are considered a part of the Confirmation.

C.2      Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall only bind the Seller upon the Sellers' broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3      The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax, assessment, duty or other charge of whatever nature and however named, or any increase of components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give the Buyer prior notice of this effect within a reasonable time after the Seller becoming aware of the relevant circumstances.

C.4      All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise.

C.5     If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right to insist as a precondition of sale that a payment guarantee is provided by the Owner. Owner is specified in Clause B.1. The Seller shall have the right to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner.

D.      SPECIFICATIONS (QUALITY – QUANTITY)

D.1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. Buyer shall also assume sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed. Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2     The quality and quantity shall be as agreed between the Seller and the Buyer and correspond to the Seller's Order-Confirmation.

D.3     Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4     In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

E.      MEASUREMENTS

E.1     The quantities of bunkers shall be determined from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2     The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present it's tank calibration and ullage sounding records, which are considered to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3     Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4     Buyer expressly undertakes not to make any endorsement, complaint/ comment on the Bunker Delivery Receipt when presented for signature. In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, with full supporting vouchers, in writing within 10 (ten) days thereof, failing which, and/or making of any endorsement whatsoever on the Bunker Delivery Receipt, shall extinguish any claim by the Buyer, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

F.      SAMPLING

F.1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2     In case that dripsampling is not available onboard barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3     The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this clause.

F.4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as

the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5     In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to clauses related hereto above in this Article, shall be deemed to be conclusive and final evidence of the quality of the product delivered. One, and only one, of the samples retained by Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which are to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6     The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present; and both parties shall have the right to appoint independent person(s) or institute(s) to witness seal breaking. No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.7     Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.


G.      DELIVERY

G.1     The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2     The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/ sshinc of these dates, always subject to the circumstances set out below in Article G.3.

G.3     Vessel shall be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges. Seller shall not be liable for any consequences or any time lost due to Buyer's Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, Seller shall not be obligated to deliver prior to the nominated date or spread of dates.

G.4     In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours notice, where the last notice must specify the exact place of delivery. The notices of delivery must be given to Sellers and the Seller's representatives/agents.

G.5     The Seller shall be entitled to deliver the Bunkers in special part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6     The Seller shall not be required to deliver any bunkers for export if any government permit required has not been obtained in due time before the delivery.

G.7     If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that it as a result thereof may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated supply among its customers in such a manner as it may determine most reasonable in its sole discretion.

G.8     The Vessel in question shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9     The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in a Supplier's opinion clear and safe berth or anchorage is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10    The Buyer's Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses, and in any way requested to assist barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery. During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are completely

checked and being ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
Local further special requirements for receiving bunkers must be followed strictly by the receiving Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the awareness of such eventual additional requirements for safety reasons.

G.11    In the event that the Buyer's Vessel is not able to receive the delivery promptly, the Buyer is thereby in breach of Article G.8 above and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12    Delivery shall be deemed completed and all risk, including loss damage, deterioration, depreciation, evaporation or shrinkage to the Bunkers delivered shall pass to the Buyer from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form at a lower price than that applicable to the grade originally nominated by the Buyer. The Seller may use this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these terms.

G.14    The Buyer's Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified immediately after such test period has expired.

G.15    If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16    In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, such damage is to be dealt with by the Owners directly of the involved units, and Seller/Supplier cannot be held responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

H.        TITLE

H.1       Title in and to the Bunkers delivered and/or property rights in and to such
          Bunkers shall remain vested in the Seller until full payment has been received
          by the Seller of all amounts due in connection with the respective delivery.

H.2       Until full payment of any amount due to the Seller has been made and
          subject to Article G.14 hereof, the Buyer shall not be entitled to use the
          Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell,
          encumber, pledge, alienate, or surrender the Bunkers to any third party or
          other Vessel.

H.3       In case of non or short payment for the Bunkers by the Buyer the Seller is
          entitled to take back the Bunkers without prior judicial intervention, without
          prejudice to all other rights or remedies available to the Seller. For the
          avoidance of doubt the Buyer does not give any representation as to any
          conflicting rights of third parties.

H.4       In the event that the Bunkers have been mixed with other bunkers onboard
          the Vessel, the Seller shall have the right of lien to such part of the mixed
          Bunkers as corresponds to the quantity or net value of Bunkers delivered.

H.5       In case the Bunkers, in part or full, are no longer present or can no longer be
          identified or distinct from other Bunkers, the Seller has the right to arrest/attach
          the Vessel and/or sister ship and/or any other assets of the Buyer (or the
          Owner of the Vessel), cf. Clause C.5) wherever situated in the world without
          prior notice.

H.6       Where, notwithstanding these GTC's, title in and to the Bunkers delivered has
          passed to the Buyer and/or any third party before full payment has been
          made to the Seller, the Buyer shall grant a pledge over such Bunkers to the
          Seller. The Buyer shall furthermore grant a pledge over any other Bunkers
          present in the respective Vessel, including any mixtures of the delivered
          Bunkers and other bunkers. Such pledge will be deemed to have been given
          for any and all claims, of whatever origin and of whatever nature that the
          Seller may have against the Buyer.

I.        PAYMENT

I.1       Payment shall be made by the Buyer as directed by the Seller within the
          period agreed in writing.

I.2       Payment shall be made in full, without set-off, counterclaim, deduction
          and/or discount free of bank charges to the bank account indicated by the
          Seller on the respective invoice(s).

I.3       Notwithstanding any agreement to the contrary, payment will be due
          immediately in case of bankruptcy, liquidation or suspension of payment or
          comparable situation of the Buyer, or arrest of assets and/or claims of the

Buyer, or in case of any other situation, which in the sole discretion of the Seller, is considered to adversely affect the financial position of the Buyer.

I.4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5     Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 2 (two) per cent per month (compounded monthly for each month (or part thereof) of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.00 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 250.00 for each delivery made, and Seller holds the full right to involve internal and external legal assistance and to charge costs for same against Buyers.

I.6     Payments made by the Buyer shall at all times be credited in the following order: (1) costs, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7     All costs borne by the Seller in connection with the collection of overdue payments, whether made in or out of court and in general all costs in connection with breach of this agreement by the Buyer, shall be for the sole account of the Buyer.

I.8     The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the agreement. Failing immediate provision of such security upon Seller's demand, the Seller shall be entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9     While it is understood that the Buyer does not give any representation as to any conflicting rights of third parties, the Buyer accepts and agrees that until full payment has been received in Seller's bank/account  the Seller holds a lien on the Bunkers onboard and in the Vessel itself.


J.      CLAIMS

J.1     In addition to the obligations referred to in Article E.4 above, any claim in connection with the quantity of Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or Vessel Master fails to present such immediate notice of protest to the Seller or

Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

Furthermore, any eventual changes or remarks made by Buyer or Buyer's Vessel, including a "No Lien" stamp or remark on the Bunker Delivery Receipt shall have no effect or value whatsoever and shall suffer the consequences set out in Article E.4 above.

J.2     Any and all claims concerning the quality of the bunkers delivered shall be submitted to the Seller in writing within 20 (twenty) days after delivery with a clear statement as to the nature or the claim(s) along with supporting documentation in support, failing any which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes. Also see Article G.14.

J.3     The Buyer shall be obliged to make payment in full (ref Article I.2 above) and fulfil all other obligations in accordance with the terms hereof, whether or not they have any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall use commercially reasonable efforts to obtain authorization from Owner to allow the herein stated steps and to provide all commercially reasonable assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require.  If the Buyer is in breach of its obligations according to this article such breach shall constitute a waiver of the Buyer's claim

J.4     In each and every case, any and all claims of the Buyer shall be time barred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Article P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the written Order Confirmation from the Seller.

K.      LIABILITY

K.1     The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, unless such damages or delay have been caused by fault or gross negligence on the side of the Seller.

K.2     Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3     The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not onboard of the respective vessel(s).

K.4.    Every exemption, limitation, condition and liberty herein contained, and every right, exemption from liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall be available to and shall extend to protect every servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to employed by the Seller/Supplier).

L.      EXEMPTIONS AND FORCE MAJEURE

L.1     Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage or demurrage due to any delay or failure in their performance (a) by reason of compliance with any order or request of any government authority, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or unavailability of product and/or barge equipment or inadequate for any cause whatsoever that is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused by labour disputes, strikes, governmental intervention, wars, civil commotion, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God, providing that the event cannot be mitigated by the Seller or the Supplier using commercially reasonable efforts. The Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

L.2     If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3     Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same.

L.3     In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4     (a)     These Terms and Conditions are subject to variation in circumstances where the physical supply of the fuel is being undertaken by a third party.  In such circumstances, these terms and conditions shall be varied accordingly,

and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the third party on the Seller.

(b)    Without prejudice to the generality of the foregoing, in the event that the third party terms include:

(i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

(ii)    Any additional exclusion of liability clause contained in third party terms shall be incorporated mutatis mutandis into these terms and conditions.

(ii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms.

The terms hereof shall be varied to apply any of the terms being imposed on Sellers by the third party supplier.

(c)    It is acknowledged and agreed that the buyer shall not have any rights against the supplier which are greater or more extensive than the rights of the supplier against the Third Party.


M.           BREACH/CANCELLATION

M.1          The Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

               a)          when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

               b)          when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out herein;

               c)          when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2          The Seller may terminate any agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer.

M.3          The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:
A) The Vessel; or

B) The Charterer of the Vessel; or
C) The fully or partly Owner(s) of the Vessel; or
D) Any officers of the Vessel; or
E) The Operator and/or Manager of the Vessel; or
F) Any other person or entity in any way related to the Agreement or delivery is/are
1) Iranian(s); or
2) Related in any way to Iran or Iranians; or
3) Listed on the US OFAC Specially Designated Nationals List; or
4) Covered by any US, UN, EU sanctions; or
5) Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this clause.
The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items A) to F) in combination with any of the above items 1) to 5) are fulfilled.
Should the Buyer breach its obligation to inform the Seller, the Buyer must indemnify and keep the Seller harmless for any damage or loss caused by such breach, including liquidated damages.

N.        SPILLAGE, ENVIRONMENTAL PROTECTION

N.1       If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the generality of the foregoing the Seller is hereby authorised in its full discretion, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof, that is required by the Seller, or are required by law or regulation applicable at the time and place of delivery.

O.        DELAYS AND CANCELLATIONS

O.1       Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole

discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 48 hours from the (last) nomination date.

O.2    If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller/Supplier as a result of the cancellation, including, but not limited to, barge costs, re-storing of Bunkers, and Hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified in a minimum amount of USD 4,000 by way of agreed liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

P.      LAW AND JURISDICTION

P.1    This agreement shall be governed and construed in accordance with the laws of England.

P.2    All disputes arising in connection with this agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, will be finally settled by arbitration in London under the rules of the London Maritime Arbitrators Association as in effect from time to time by one or more arbitrators appointed in accordance with such rules.

P.3    Any eventual National or International Laws or Regulations (CISG) being referred to by the Buyer in any event, shall be deemed not be valid in any respect, in whole or in part, but solely the articles related to Arbitration as stated elsewhere in this Article P.

P.4    For the sole benefit of the Seller it is further agreed that the Seller without prejudice to any rights hereunder of the Seller or any claim raised pursuant to Clause P.2 above have the right to proceed against the Buyer, any third party or the Vessel in such jurisdiction as the Seller in its sole discretion sees fit inter alia  for the purpose of securing payment of any amount due to the Seller from the Buyer or the Owner (pursuant to a payment guarantee). In such circumstances the proceedings shall be governed by the law (substantive and procedural) of such jurisdiction.

Q. ANTICORRUPTION

Q.1    In respect of any services to be provided by the Seller outside of Canada or the United States ("Offshore"), the Seller  represents and warrants that none of its or its affiliates' principals, shareholders, directors, officers, employees or its correspondents is an official, agent, employee, or representative of any Offshore national, provincial, or local government, political party, political candidate, or public international organization, nor are any of them immediate family

members (parent, child, spouse, sibling) of such an official, agent, employee, or representative. the Seller shall promptly notify the Buyer if such circumstances change during the term of these Terms.  Upon such notification, the Buyer may impose such restrictions on the participation of such personnel in the performance of the Seller's obligations as the Buyer deems necessary to ensure compliance with this provision.

Q.2     In performance of its Offshore obligations under these Terms, neither the Seller, nor any person acting on behalf of the Seller, shall (a) authorize the giving of, offer, or give anything of value to any Offshore government official, a political party or party official, a political candidate, or an official of a public international organization for the purpose of influencing or inducing the recipient to obtain, retain, or direct business for or to any person or for the purpose of securing any improper advantage, or (b) authorize the giving of, offer, or give anything of value to any other person with knowledge or firm belief that all or a portion of the payment or gift will be offered, given, or promised, directly or indirectly, to any of the persons described in subparagraph (a), for any of the purposes stated in subparagraph (a).

Q.3     The Seller shall not retain any agents, subagents, representatives, consultants, correspondents or other persons to assist in carrying out the Seller's Offshore duties under this Agreement without the prior written consent of the Buyer.

Q.4     If the Seller's Offshore performance under these Terms is determined by the Buyer to be contrary to (a) the Canadian Corruption of Foreign Public Officials Act, (b) the U.S. Foreign Corrupt Practices Act, or (c) the Seller's representations as set forth in these Terms, then these Terms shall be null and void from its inception, and in such event any Offshore compensation paid or accrued shall be forfeited by the Seller, and no future Offshore payments or accruals shall be made by the Buyer for the Seller's account.

# EXHIBIT 10

Case 1:15-cv-01351-VEC   Document 1   Filed 02/24/15   Page 76 of 90



**Chevron**

## Marine Lubricants

Marine Lubricants Home > Products > Fuels > Terms of Sale

# Terms of Sale

## Terms of Sale for Marine Fuels, July 2007

1. Prices
2. Parties Obligated
3. Quality and Warranty
4. Nominations and Deliveries
5. Title/Risk of Loss
6. Inspection and Determination of Quantity and Quality
7. Claims
8. Payment
9. Safety and Environmental Protection
10. Indemnity
11. Force Majeure
12. Miscellaneous
13. Governing Law
14. Dispute Resolution

Except as otherwise specifically agreed to in writing in the agreement ("Part 1") incorporating these Terms of Sale for Marine Fuels (the "Terms of Sale"), the following terms and conditions shall apply to all sales by Chevron Marine Products LLC ("Seller") or its Affiliates of bunker fuel oil, intermediate bunker fuels, marine diesel oil, and marine gas oil (collectively hereinafter "Marine Fuels"). Part 1 and these Terms of Sale (collectively, the "Contract") contain all agreements, arrangements and stipulations between the parties in respect of the supply of Marine Fuels contemplated herein and supersede all prior agreements, arrangements and stipulations in respect of the same subject. Except where otherwise expressly stated in these Terms of Sale, in the case of any conflict between the documents comprising the Contract, Part 1 shall be given priority over the Terms of Sale as used in the Contract, "Affiliates" means any legal entity which controls, is controlled by, or is under common control with, another legal entity, and "control" means legal or beneficial ownership of fifty percent (50%) or more of the shares in a legal entity entitled to appoint directors or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity.

**1. Prices**
(a) The price for Marine Fuels shall be Seller's spot or term price offered in Part 1 for a specific delivery or

series of deliveries Spot prices offered shall be valid for deliveries made on, before or within three (3) calendar days following the Accepted Delivery Date, as defined in Clause 4(a) The four (4) calendar day period comprising the Accepted Delivery Date and the three (3) calendar days thereafter are referred to herein as the "Pricing Date Range " Spot prices for delivery after the Pricing Date Range are subject to change at Seller's sole option

(b) Buyer shall pay any taxes, fees or other charges, imposed by any national (or political subdivision thereof) taxing authority on the delivery, sale, inspection, storage and use of Marine Fuels, except for taxes on Seller's income and taxes on raw material or Seller's income taxes on the finished product To the extent Seller incurs any of Buyer's taxes listed in the Contract, Seller's invoice will include such taxes as payable by the Buyer.

(c) If Buyer is entitled to purchase any Marine Fuels free of any taxes, duties or charges pursuant to local law, Buyer shall promptly, but in any event not later than five (5) business days following completion of delivery, provide to Seller a valid exemption certificate for such purchase. Buyer and Seller agree that invoices shall conform to local laws of the country in which the sale is completed

(d) Any foreign or domestic tax, duty, toll, fee, license, impost, charge or other exaction of any charges whatsoever, including VAT, excise taxes and any similar taxes, or the amount equivalent thereto and any increase thereof, now or hereafter (i) imposed, levied or assessed (but exclusive of taxes based on the Seller's income) by any national (or political subdivision thereof) taxing authority directly or indirectly upon, (1) the Marine Fuels and/or, (2) the production, manufacture, transportation, storage, sale, use, transfer, delivery and/or other handling of the Marine Fuels and/or, (3) the production, manufacture, transportation, storage, purchase, sale, use, transfer, exportation, importation and/or other handling of any material contained in the Marine Fuels, or any wholly or partly refined or manufactured part thereof, and/or, otherwise (ii) measured by, incident to or as a result of the transaction herein provided for, shall, if collectible or payable by Seller, be paid by Buyer on demand by Seller Any such payment not included in the Marine Fuels prices otherwise herein provided for, shall be in addition thereto

Back to Top

## 2. Parties Obligated
(a) Should Marine Fuels be ordered by an agent, then such agent, as well as the principal, shall be bound by, and liable for, all obligations as fully and as completely as if the agent were itself the principal, whether such principal is disclosed or undisclosed, and whether or not such principal purports to contract as agent only Notwithstanding anything to the contrary in this Contract, Principal and agent shall each be deemed to be a Buyer for purposes of this agreement

(b) Marine Fuels delivered hereunder are sold and delivered on the financial credit of the vessel being supplied (the "Vessel"), as well as on the promise of the Buyer to pay therefor Buyer warrants that Seller shall have the right to assert a lien against the Vessel covering the Marine Fuels delivered for the purchase price, any extra charges incurred in accordance herewith, any taxes billed on the delivery of Marine Fuels or otherwise, and all associated recovery costs Such remedy shall be in addition to, and not in limitation of, any other remedies available to it at law or herein

Back to Top

## 3. Quality and Warranty

(a) Marine Fuels shall be Seller's commercial grades of Marine Fuels generally offered to Seller's Marine Fuels customers at the time and place of delivery. EXCEPT FOR THIS SECTION 3(A), THE MARINE FUEL IS SOLD "AS IS", AND SELLER OTHERWISE MAKES NO WARRANTIES OF QUALITY, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY IMPLIED WARRANTIES OR CONDITIONS WHETHER STATUTORY OR OTHERWISE ARE EXPRESSLY EXCLUDED.

(b) Buyer shall have the sole responsibility for the selection of suitable Marine Fuels for use in the Vessel, and warrants that the Vessel(s) nominated by Buyer to receive Marine Fuels is/are in compliance with all local, national and international regulations and requirements, as applicable.

Back to Top

## 4. Nominations and Deliveries

(a) Nomination. Buyer shall nominate a Vessel in writing at least five (5) Business days (defined as days on which banks are normally open for business at the delivery port or other location where sales hereunder are made) in advance of the Estimated Time of Arrival (the "ETA") proposed by Buyer, specifying delivery port, ETA and grades, specifications and quantities of Marine Fuels required. If such nomination is accepted and confirmed in writing by Seller, the ETA proposed by Buyer (or otherwise agreed between Buyer and Seller) shall become the "Accepted Delivery Date". Unless advised in writing by Buyer and confirmed in writing by Seller, amendments to the Accepted Delivery Date will not be recognized. Seller may cancel any nomination without liability and without prejudice to any rights Seller may have against Buyer if the Vessel does not arrive at delivery port and present itself for delivery on the Accepted Delivery Date. Except where contrary to local governmental or port regulations, all deliveries to Seller's customers will be made on a first come first served basis.

(b) Confirmation. Buyer shall give Seller at least forty-eight (48) hours advance written notice, excluding Sundays and non-Business days confirming type and quantities of Marine Fuels and other delivery details If such delivery date is not within the Pricing Date Range, then any exception and acceptance must be in writing by Seller. When forty-eight (48) hours advance notice is not given or when the delivery date is not within the Pricing Date Range and the proposed new delivery date is not accepted by Seller in writing, then Seller may deliver or not, in its sole discretion

(c) When delivery is required other than during normal business hours, and is permitted by applicable regulations, Buyer shall be fully responsible for and pay all overtime and extra expenses incurred by Seller.

(d) When delivery is made by barge, truck or coastal tanker (hereinafter collectively "Seller's delivery vessel"), all delivery charges, including overtime and associated charges, shall be for the account of Buyer. For delay caused by Buyer in the use of Seller's delivery vessel, Buyer shall pay any demurrage or detention charges at such rate as may be invoiced by Seller.

(e) Buyer shall notify Seller, in writing, prior to delivery, of the maximum allowable pumping rate and pressure for the Vessel and Buyer and Seller shall agree on communication and emergency shutdown procedures.

(f) Buyer shall notify Seller, in writing, prior to delivery of any special conditions, difficulties, peculiarities,

deficiencies or defects in respect of or particular to the Vessel that might adversely affect the delivery of Marine Fuels. Buyer shall be responsible for any increased costs incurred by Seller in connection therewith. If in the opinion of Seller, such special conditions, difficulties, peculiarities, deficiencies or defects call into question Seller's ability to make a safe delivery, Seller may cancel the nomination without liability.

(g) When delivery is made by Seller's delivery vessel, the Vessel shall provide a free and safe berth alongside to receive the Marine Fuels and to render all necessary assistance that may reasonably be required to safely moor and unmoor the Seller's delivery vessel or to connect or disconnect the delivery hose(s).

(h) If Buyer cancels, terminates or otherwise fails to take delivery, in whole or in part, of the quantities nominated, Buyer shall be responsible for any costs resulting from such failure, including without limitation, lost profits and any costs and expenses incurred by Seller to downgrade the Marine Fuels.

(i) Seller shall exercise reasonable efforts to adjust to changes in Buyer's schedule. However, Seller or Seller's supplier shall not be liable for demurrage paid or incurred by Buyer due to any delay in delivery of Marine Fuels when:

1) The delivery date was not within the Pricing Date Range or was not otherwise accepted by Seller as outlined in Sections 4(a) and 4(b).

2) Forty-eight (48) hours notice, as defined in Section 4(b), was not given.

3) Seller's delivery vessel arrived in a timely fashion and performed according to accepted practice.

4) Conditions as set forth in Section 11 below existed.

5) Seller was ready and able to perform, or

6) Conditions onboard Vessel resulted in failure to receive Marine Fuels.

<u>Back to Top</u>

## 5. Title
a) Delivery shall be deemed completed and title to and risk of loss of Marine Fuels shall pass to Buyer at the permanent intake connection between Seller's loading hose and the Vessel.

(b) If delivery is made to barge, truck or coastal tanker nominated by Buyer (hereinafter "Buyer's delivery vessel"), delivery shall be deemed completed and title to and risk of loss of the Marine Fuels shall pass to Buyer at the last flange of Seller's or Seller's supplier's loading hose at the loading terminal .

(c) Buyer shall be responsible for connection of the loading hose to the intake of the Vessel or Buyer's delivery vessel and pumping shall be performed under the direction of Buyer's representative.

<u>Back to Top</u>

## 6. Inspection and Determination of Quantity and Quality
(a) The quantity of Marine Fuels delivered shall be determined, at Seller's option, by measurements in accordance with either (i) the ASTM Petroleum Measurement Table for Seller's shore tanks or Seller's

delivery vessel or (ii) Seller's meters. Buyer will be charged for Marine Fuels on the basis of these measurements. Buyer at its own expense has the right (and is encouraged) to have its representative or an independent inspector present during measurement, but determination of quantity shall be made solely by Seller. All such measurements noted above shall be final and binding save for manifest error.

(b) Sampling by Seller or Seller's supplier shall be accomplished throughout the Marine Fuels delivery process. Seller or Seller's supplier shall take four (4) representative samples of each grade of Marine Fuels to be delivered. Buyer shall have the right (and is encouraged) to have its representative witness the drawing of the samples. The aforementioned samples shall be securely sealed and labeled, numbered and identified by name of the Vessel, delivering facility, Marine Fuel type, delivery date and place of delivery. One (1) sample shall be given to Buyer's representative for MARPOL compliance purposes only; the second sample shall be given to Buyer's representative for quality determination purposes; and the other two (2) samples shall be retained by Seller or Seller's supplier for at least thirty (30) days following the date of delivery in a safe place for subsequent verification of the quality thereof, if required. If Buyer issues a claim regarding the quality of the Marine Fuel within thirty (30) days after the date of delivery in accordance with Section 7(b) below, one (1) of the two (2) remaining samples of Seller together with any other Seller's and Seller's supplier's representative samples shall be submitted for analysis to a mutually agreed independent laboratory. The independent laboratory's analysis shall be conclusive as to the quality of the Marine Fuel delivered. The analysis shall be established by tests in accordance with ISO 8217 and/or any other specifications agreed to between Buyer and Seller in writing. Unless otherwise agreed, the expenses of the analysis by the independent laboratory shall be borne equally by Seller and Buyer. Any cost associated with the Buyer appointing a representative to witness the sample seal-breaking and/or analysis at the independent laboratory shall be the sole responsibility of Buyer.

<u>Back to Top</u>

### 7. Claims
(a) Any dispute as to the quantity of the Marine Fuels delivered must be noted at the time of delivery on the bunker delivery receipt or in a letter of protest. Any claim as to short delivery shall be presented by Buyer in writing within fifteen (15) calendar days after the date of delivery, failing which any such claim shall be deemed to be waived and forever barred.

(b) Any claim as to the quality of the Marine Fuels delivered must be submitted by Buyer to Seller in writing within thirty (30) days after the date of delivery, failing which, such claim shall be deemed waived and forever barred. Buyer shall base its quality claim solely on an analysis of the retained sample provided by Seller at the time of the delivery as provided for in Section 6(b) above. Buyer shall promptly furnish Seller the results of testing of the retained sample to enable Seller to properly evaluate the claim.

(c) Despite the provisions of Section 3(a), Buyer shall take all reasonable measures, including retention and burning of Marine Fuels in accordance with Seller's instructions, to eliminate or minimize any costs associated with an off-specification or suspected off-specification supply. Seller's obligation shall not exceed direct expenses incurred for removal and replacement of Marine Fuels. If Buyer removes such Marine Fuels without the consent of Seller, then all such removal and related costs shall be for Buyer's account. Notwithstanding anything in this Contract to the contrary, (i) Seller's obligations or liabilities hereunder shall not include any consequential or indirect damages, including without limitation, deviation costs, demurrage,

damage to any Vessels or Buyer's delivery vessels or to their engines or tanks, and any actual or prospective loss of profits, and (ii) other than this Section 3(c) in the event of personal injury or death, Seller's maximum liability under this Contract shall not exceed the price charged to the Buyer for the Marine Fuels supplied under this Contract. It is a condition precedent to any obligation for payment by the Seller that all sums due to it from the Buyer shall have first been paid.

(d) Seller shall not be responsible for any claim arising in circumstances where there is or has been commingling of Marine Fuels delivered by Seller with other fuel aboard the Vessel or Buyer's delivery vessel.

(e) Any claim involving demurrage incurred by the Buyer's receiving vessel must be submitted by Buyer to Seller in writing within 30 days of the date of delivery. If Buyer fails to submit a demurrage claim within (30) days after the date of delivery, any such claim shall be deemed to be waived and absolutely barred.

(f) Seller shall respond promptly to any complaint or claim by Buyer and the parties shall further endeavor to resolve the matter one way or the other within forty-five (45) days of receipt of claim. Where Buyer and Seller cannot come to agreement on such claim within ninety (90) days, either party may invoke the dispute resolution procedures in accordance with the provisions of Section 14 below. However, nothing in this Section 7 shall relieve the Buyer of its obligation to make payments in full when due as provided herein.

Back to Top

## 8. Payment

(a) Payment shall be made by Buyer, in U.S. dollars, without discount, offset or deduction prior to the time specified in Section 8(b) and in accordance with Seller's written, telegraphic or other notification of invoice specifying quantities of Marine Fuels delivered and amounts due. Seller may make subsequent adjustments to invoiced amounts based upon information contained in the relevant bunker delivery receipt. Buyer's failure to make payment in full of the amount noted by Seller shall be a breach of Buyer's obligations hereunder; moreover, any claims related to the delivery of Marine Fuels shall not relieve Buyer from paying Seller in full. Payment made by telegraphic transfer or by bank draft shall be forwarded to the address noted in Part 1 of the Contract.

(b) Payment shall be considered past due if not received by Seller within thirty (30) days after the date delivery of Marine Fuels commences. Overdue payments shall be subject, at Seller's sole discretion, to a service charge at the rate of two percent (2%) per thirty (30) day period or the maximum rate permitted under applicable law, whichever is less. If at any time Seller considers Buyer's financial condition inadequate to meet Buyer's obligation hereunder, cash payment in advance or security acceptable to Seller may be required before delivery and Seller may declare any amount then outstanding from Buyer to be immediately due and payable.

(c) The Buyer shall periodically provide to Seller that financial information or security deemed necessary by Seller to support any credit extension. If during the life of this Contract, the financial capacity of Buyer becomes impaired or unsatisfactory to Seller in the sole judgment of Seller, advance cash payment or security satisfactory to Seller shall be given by Buyer on demand by Seller and shipments/deliveries may be withheld until such payment or security is received.

Back to Top

## 9. Safety and Environmental Protection

(a) Buyer is familiar with the health effects related to the Marine Fuels supplied hereunder and with relevant protective safety and health procedures for the handling and use of such Marine Fuels. Buyer shall adhere to such safety and health procedures while using or handling Seller's Marine Fuels. Buyer shall also facilitate the dissemination of health and safety information to all employees, users, and others potentially exposed to the Marine Fuels sold hereunder. Buyer shall be responsible for compliance by its employees, agents, and other users with all health and safety requirements or recommendations related to the Marine Fuels supplied hereunder and shall exert its best efforts to assure that any of its employees or agents, users, and others avoid frequent or prolonged contact with or exposure to the Marine Fuels both during and subsequent to delivery. Seller or Seller's supplier accepts no responsibility for any consequence arising from failure by Buyer, its employees or agents, any users, or any other party to comply with relevant health and safety requirements or recommendations relating to such contact or exposure.

(b) If a spill occurs while Marine Fuels are being delivered, Buyer and Seller shall promptly take such action as is reasonably necessary to remove the spilled Marine Fuels and mitigate the effects of such spills. Seller is hereby authorized, at its option and at the expense of Buyer, to take such measures and incur such expenses (whether by employing its own resources or contracting with others) as are reasonably necessary in the judgment of Seller to remove the spilled Marine Fuels and mitigate the effects of such spills. Buyer shall cooperate and render such assistance as is required by Seller in the course of such action. All expense, claims, loss, damage, liability and penalties arising from spills shall be borne by the party that caused the spill. If both parties are at fault, all expense, claims, loss, damage, liability and penalties shall be divided between the parties in accordance with the respective degrees of fault.

(c) In the event of a spill during fueling, Buyer shall provide Seller with such documents and information concerning the spill and any programs for the prevention of spills as may be required by Seller or by law or regulations applicable in the port where the spill occurred.

(d) Buyer warrants that the Marine Fuels purchased hereunder shall be used for the operation of the nominated Vessel and that Vessel only.

(e) Buyer warrants that the Vessel is in compliance with all applicable national and international laws and regulations. The Vessel is subject to Seller's acceptance and will not be supplied Marine Fuels unless free of all conditions, difficulties, peculiarities, deficiencies or defects that might impose hazards in connection with its mooring, unmooring or bunkering.

(f) Buyer shall comply with all applicable laws and regulations in carrying out its obligations under this Contract, including the ISPS Code and to the extent applicable, MARPOL 73/78 Annex VI. Seller and its duly authorized representatives shall have access to the accounting records and other documents maintained by the other party which relate to the Marine Fuels being delivered under this Contract, and shall have the right to audit such records once a year at any reasonable time or times within twenty-four (24) months of the rendition of any statement or invoice forming the basis of such claim

Back to Top

## 10. Indemnity

Buyer shall indemnify and hold Seller and Seller's Affiliates and supplier harmless from and against any and

all claims, demands, suits or liabilities for damage to property or for injury or death of any person, or for non-compliance with any requirement of any governmental entity arising out of an act or omission of Buyer or its agents or servants in receiving, using, storing or transporting Marine Fuels delivered hereunder, including exposure thereto, unless the same be due to the sole negligence of Seller.

Back to Top

## 11. Force Majeure

Either Party will be excused from its obligations hereunder to the extent that its performance is delayed, substantially hindered or prevented by circumstances beyond its control (hereafter "Force Majeure") including, but not limited to, acts of God, weather, harbor conditions, fire, explosions, mechanical breakdown, strikes, plant shutdowns, civil disturbances and government regulations. Such Force Majeure shall not excuse Buyer's obligation to make payment for Marine Fuels received. Seller shall not be liable for any demurrage or other costs resulting from any delay or failure to perform on the part of Seller caused by Force Majeure. The Party declaring Force Majeure shall give prompt written notice and full particulars of such event to the other Party. The declaring Party shall attempt to remedy the Force Majeure with all reasonable dispatch, but if such Force Majeure continues beyond the end of the Pricing Date Range, this Contract may be terminated by written notice from either Party. Seller shall not be obligated to make up any deliveries not fulfilled as a result of Force Majeure.

Back to Top

## 12. Miscellaneous

(a) If performance by Seller becomes impracticable for any reason, including, but not limited to, orders, requests or suggestions by any official body relating to supplies, priorities, rationing or allocations of crude oil from which Marine Fuels are derived or any other petroleum products, Seller may reduce or stop deliveries in such a manner as it may in its sole discretion determine and shall be relieved of its obligation to perform hereunder despite that such cause(s) is not attributable to Force Majeure.

(b) Except as otherwise expressly provided herein, no director, employee or agent of Buyer, its subcontractors or vendors, shall give or receive from any director, employee or agent of Seller or any affiliate, any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Contract. In addition, no director, employee, or agent of Buyer, its subcontractors or vendors, shall enter into any business arrangement with any director, employee, or agent of Seller or any affiliate who is not acting as a representative of Seller or its affiliate without prior written notification thereof. In carrying out its responsibilities under this Contract, Buyer will not pay or agree to pay, directly or indirectly, any funds or anything of value to any public official or official of a public or international organization for the purpose of influencing such person's official acts or decisions. Any representative(s) authorized by Seller may audit the applicable records of the last three years of Buyer for the sole purpose of determining whether there has been compliance with this Section 12(b).

(c) Buyer may not assign its rights or obligations hereunder without the prior written consent of Seller, such consent not to be unreasonably withheld or delayed. Seller may freely assign its rights and obligations hereunder to any third party, in which case such assignee shall become the Seller and assume all of Seller's rights and obligations under this Contract with no further obligation or liability on the party of Chevron Marine Products LLC. No assignment shall require either Party to conduct business with a third party in violation of

any applicable laws, rules or regulations, and either Party may terminate this Contract forthwith if any such laws rules or regulations would or could be violated as a result of such assignment.

(d) If any provision or portion of this Contract shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, such provision or portion of this Contract shall be deemed omitted and the remaining provisions and portions shall remain in full force and effect.

(e) Modifications or amendments to the Contract shall be valid only when expressly agreed upon in writing. The waiver or failure to require the performance of any covenant or obligation contained herein shall not be deemed to constitute a waiver of a similar later breach.

(f) Notices under this Contract shall be made and deemed duly given only when delivered in writing to the other party to the address set forth in Part 1, or such updated address as may be specified by a party from time to time.

Back to Top

## 13. Governing Law

This Contract shall be governed and construed in all particulars by the laws of the State of New York, United States of America, without regard to those laws that would reference the laws of another jurisdiction.

Back to Top

## 14. Dispute Resolution

All unresolved disputes and claims arising in connection with the sale of Marine Fuels to which these Terms of Sale apply shall be referred to arbitration conducted in the City of New York in accordance with the Commercial Rules of the American Arbitration Association. For claims stated in an amount of $10,000 or less, the unsuccessful party shall pay all out-of-pocket arbitration costs. The proceedings and decision of the arbitrator shall be in English, and decision shall be delivered no later than one hundred twenty (120) days after referral to arbitration or as soon thereafter as possible. Prior to arbitration, should the parties fail to agree on an arbitrator within sixty (60) days of referral to arbitration, either party may request selection of an arbitrator by the American Arbitration Association, which selection shall be accepted by the parties.

Back to Top

PRINTABLE VERSION

© 2001- 2015 Chevron U S A  Inc  All rights reserved  All trademarks are property owned by Chevron Intellectual Property LLC  Terms of Use | Privacy Statement | Site Map

# EXHIBIT 11

Our Ref: CCM/FBH/JXR/17070/13



**BEEVER** *and* **STRUTHERS**

CHARTERED ACCOUNTANTS
& BUSINESS ADVISORS

16 January 2015

**TO WHOM IT MAY CONCERN**

Dear Sirs

*O.W. Bunkers (UK) Limited – In Administration (the Company)*

I am writing to advise you that I, Charles MacMillan, was appointed Administrator of the Company on 12 December 2014. I am licensed to act as an Insolvency Practitioner in the UK by the Institute of Chartered Accountants in England and Wales. Attached is formal notice of my appointment, form 2.12B.

I can further advise that on 12 November 2014, Paul David Copley, Ian David Green and Anthony Victor Lomas of PricewaterhouseCoopers LLP were appointed as Joint Receivers (the **Receivers**) of the Company. The appointment is under an English Omnibus Security Agreement dated 19 December 2013 between O.W. Bunker & Trading A/S and certain of its subsidiaries including the Company and ING Bank N.V. (**ING**) (the **Security Agreement**). The Security Agreement defines the assets over which ING hold security and ultimately the assets over which the Receivers are appointed.

As part of the Security Agreement the Company assigned and charged to ING all rights, title and interest in its third party and intercompany receivables, both current and future (**Receivables**).

Further on 22 December 2014 the Receivers, ING and I as Administrator (the **Parties**) reached an agreement in the form of a Co-operation Agreement in the collection of Receivables assigned and charged to ING. The purpose of the Co-operation Agreement is that the Parties can work together with the Receivables global collections team in Denmark to maximise recoveries.

In accordance with the Co-operation Agreement any monies due to the Company should be paid to the ING account details as set out on their respective invoices, without delay.

It should be noted that upon making payments in respect of the Receivables your debt with the Company, under the specific invoices outstanding, will be deemed to have been settled.

Should you require any further clarification do not hesitate to contact me on 0161 832 4901.

Yours faithfully
For and on behalf of
O.W. Bunkers (UK) Limited

Charles MacMillan
*Administrator*

*Enc*

Head Office:

ST. GEORGE'S HOUSE
215 - 219 CHESTER ROAD
MANCHESTER M15 4JE

TELEPHONE : 0161 832 4901
FACSIMILE : 0161 835 3668
www.beeverstruthers.co.uk

ALSO AT BLACKBURN AND LONDON



INVESTORS
IN PEOPLE

Rule 2.27

Form 2.12B

The Insolvency Act 1986

# Notice of administrator's appointment

| Name of Company<br>O.W. Bunkers (UK) Limited | Company number<br>03978855 |
|---|---|
| In the High Court of Justice, Manchester District Registry<br>[full name ofCourt] | Court case number<br>3404 of 2014 |

(a) Insert full name(s) and address(es)

I Charles MacMillan of Beever and Struthers, St George's House, 215-219 Chester Road, Manchester, M15 4JE

give notice that I was appointed as administrator(s) of the above company on:

(b) Insert date

| (b) 12 December 2014 |
|---|

Signed _____

Dated ____12 | 12 | 2014____

Administrator IP No 6000

Contact Details:

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record

| Jill Redmond | |
|---|---|
| St George's House, 215-219 Chester Road, Manchester, M15 4JE | |
| | Tel |
| DX Number | DX Exchange |

| Companies House receipt date barcode |
|---|

When you have completed and signed this form please send it to the Registrar of Companies at:

Companies House, Crown Way, Cardiff, CF14 3UZ          DX 33050 Cardiff



News release
Date                            30 December 2014 – for immediate release

Contact                         David Jetuah, media relations , PwC
                                Tel: +44 (0)20 72121812, Mobile: 07531439437
                                e-mail: david.jetuah@uk.pwc.com

Pages                           3

## OW BUNKER GROUP – CO-OPERATION AGREEMENT BETWEEEN ADMINISTRATORS OF O.W. BUNKERS (UK) LIMITED, RECEIVERS AND ING BANK

On 19 December 2013, O.W. Bunker & Tradıng A/S and certain of its subsidiaries as Chargors (the **OW Bunker Group**) entered into an English Omnibus Security Agreement dated 19 December 2013 with ING Bank N.V. (**ING**) as Security Agent (the **Security Agreement**). ING acts as agent for a syndıcate of lenders to the OW Bunker Group. The Chargors are lısted at the end of this announcement

As part of that agreement, OW Bunker Group assıgned and charged to ING all rights, title and interest ın ıts third party and intercompany receivables, both current and future (**Receivables**).

Following the discovery of alleged fraud ın a Singapore subsidiary and the announcement of substantial risk management losses, on 7 November 2014 OW Bunker & Trading A/S and OW Supply & Trading A/S filed for bankruptcy ın the Danish court. Since then, a number of other Danısh and overseas subsidiaries have also filed for bankruptcy proceedings.

**On 12 November 2014, Paul David Copley, Ian David Green and Anthony Victor Lomas, of PricewaterhouseCoopers LLP, 7 More London Riverside, London in the United Kingdom (the Receivers) were appointed as joint receivers of the Security Assets (as defined in the Security Agreement), which includes the Receivables.**

**On 3 December 2014 a notice of intention to appoint administrators was filed with the High Court of Justice of England and Wales. Pursuant to a notice of appointment dated 12 December 2014 a director of O.W. Bunkers (UK) Limited (OW Bunker UK) appointed Charles Christopher Macmillan as the administrator (the Administrator) of the OW Bunker UK.**

### Co-operation agreement

On 22 December 2014, the Administrator, the Receivers and ING reached an agreement to co-operate in the collection of receivables assigned and charged to ING. Principal terms include:

- The OW Bunker collections team based ın Denmark will pursue all OW Bunker UK receivables assigned and charged to ING.



- Following the appointment of the Administrator, all recoveries from OW Bunker UK receivables will be paid into ING accounts.

- The Administrator and ING have established a process to agree or have determined which OW Bunker UK's receivables (if any) are not covered by ING's security and are available to OW Bunker UK's unsecured creditors.

- The Administrator and Receivers will consult and co-operate on issues relating to the receivables collection process and other matters where there are aligned interests.

Paul Copley, joint receiver and PwC UK partner, said:

"The agreement with the trustees of OW Bunker Denmark that we announced on 26 November established a central platform for collection of global OW Bunker receivables."

"Following the announcement on the 12 December regarding an agreement with the Provisional Liquidators of OW Bunker China, I am now delighted to announce that we have also signed a co-operation agreement with the Administrator of OW Bunker UK."

"The Administrator and we will work together with the global collections team in Denmark, to maximise recoveries."

Charles Macmillan, administrator and partner at Beever & Struthers, said:

"Working with the Receivers and the central collections team makes complete commercial sense and provides the assurance needed to customers that they will not be pursued for payments both by ING and the OW Bunker UK insolvent estate."

"OW Bunker UK customers should pay funds to the ING account details as set out on their invoices, without delay."

ENDS

**Notes to editors**

1. **Further information on OW Bunker**

OW Bunker was a leading global independent marine fuel (bunker) company founded in Denmark in 1980, with operations in 29 countries. OW Bunker acted as a physical distributor and reseller of marine fuel, and operated a fleet of around 30 bunker vessels. OW Bunker also provided risk management solutions to control costs, minimise risk and protect against market fluctuations.

**Security Agreement Chargors**

1. O.W. Bunkers (UK) Limited, (Registered No: 03978855);
2. O.W. Bunker Germany GMBH, (Registered No: HRB 100089 (Amtsgericht Hamburg);
3. O.W. Bunker China Limited, (Registered No: 0900648);
4. O.W. Bunker Malta Ltd., (Registered No: C22059);
5. O.W. Bunker (Netherlands) B.V., (Registered No: 24325325);



7.    Dynamic Oil Trading (Singapore) Pte. Ltd., (Registered No: 201221068G);
8.    O.W. Bunker Far East (Singapore) Pte. Ltd., (Registered No: 199201808K);
9.    O.W. Bunker (Switzerland) SA, (Registered No: CHE-112.483.462);
10.   O.W. Global Trading SA, (Registered No: CHE-462.568.346);
11.   O.W. Bunker Middle East DMCC, (Registered No: DMCC1013);
12.   O.W. Bunker North America Inc., (Registered No: 1088636);
13.   O.W. Bunker USA Inc., (Registered No: 0801553486);
14.   O.W. Bunker & Trading A/S, (Registered No: 66441717);
15.   O.W. Supply & Trading A/S, (Registered No: 17729071);

O.W. Bunker (Belgium) N.V. has also secured its third party and intercompany receivables under the Belgium Receivables Pledge Agreement with ING dated 19 December 2013.

2.   **Further information on the receivership**

For further information on the receivership please see http://www.pwc.co.uk/owbunker

Contact email address: owbunker-queries@uk.pwc.com


**About PwC**

PwC helps organisations and individuals create the value they're looking for. We're a network of firms in 157 countries with more than 195,000 people who are committed to delivering quality in assurance, tax and advisory services. Find out more and tell us what matters to you by visiting us at www.pwc.com

PwC refers to the PwC network and/or one or more of its member firms, each of which is a separate legal entity. Please see www.pwc.com/structure for further details.
© 2014 PricewaterhouseCoopers. All rights reserved.