105-15/PJG/GMV
FREEHILL HOGAN & MAHAR, LLP
*Attorneys for Plaintiff*
Canpotex Shipping Services Limited
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (Fax)
Peter J. Gutowski
Gina M. Venezia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CANPOTEX SHIPPING SERVICES LIMITED, individually and on behalf of M/V GLOBAL PHOENIX (IMO No. 9565053) M/V CMB GIULIA (IMO No. 9588419), and, M/V ASTON TRADER II (IMO No. 9392731), | **15 Civ. 1351 (VEC)** <br><br> **FIRST AMENDED COMPLAINT FOR INTERPLEADER** |
| Plaintiff, | |
| -against- | |
| O.W. BUNKERS (UK) LTD., O.W. SUPPLY & TRADING A/S, O.W. BUNKER USA, INC., CHEVRON MARINE PRODUCTS LLC, ING BANK N.V. | |
| Defendants. | |

Plaintiff Canpotex Shipping Services Limited, by its attorneys Freehill Hogan & Mahar LLP, files its First Amended Complaint for Interpleader pursuant to 28 U.S.C. §§1335 and 2361 against O.W. Bunkers (UK) Ltd., O.W. Supply & Trading A/S, O.W. Bunker USA, Inc., Chevron Marine Products LLC and ING Bank N.V., and respectfully alleges upon information and belief as follows:

### THE PARTIES

1.     Plaintiff Canpotex Shipping Services Limited (hereinafter "Canpotex" or "Plaintiff") is an entity organized and existing under the laws of a foreign country with its

principal place of business at P.O. Box 1600, Suite 400, 111 2nd Avenue South, CA-S7K 3R7 Saskatoon, Saskatchewan, Canada.

2.       Defendant O.W. Bunkers (UK) Ltd. (hereinafter "OW UK") is an entity organized and existing under the laws of a foreign country with its principal place of business at Pilgrim House, 2-6 William Street, GB-SL4 1 BA Windson, Berkshire, Great Britain.

3.       Defendant O.W. Supply & Trading A/S (hereinafter "OW Supply") is an entity organized and existing under the laws of a foreign country with its principal place of business at Stigsborgvej 60, 9400 Noerresundby, Denmark.

4.       Defendant O.W. Bunker USA, Inc. (hereinafter "OW USA") is an entity organized and existing under the laws of Texas with its principal place of business at 2603 Augusta Dr., Suite 440, Houston, Texas 77057.

5.       Defendant Chevron Marine Products LLC (hereinafter "Chevron") is an entity organized and existing under the laws of California with its principal place of business at 6001 Bollinger Canyon Road, Building 1, 3rd Floor, San Ramon, California 94583.

6.       Defendant ING Bank N.V. (hereinafter "ING") is an entity organized and existing under the laws of a foreign country with its principal place of business at Amsterdam Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands, and does business in this jurisdiction.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333, and this action involves admiralty and maritime claims under Fed. R. Civ. P. 9(h), inasmuch as this action involves competing claims to the payment for marine bunkers provided to three ocean-going vessels operated by Canpotex.

8.     This Court also has jurisdiction over this interpleader action pursuant to 28 U.S.C. §1335 in that: a) at least two of the claimants are of diverse citizenship; b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and c) Canpotex is the stakeholder of the funds and has deposited the cash required by §1335, covering amounts claimed against Canpotex and the subject vessels as more particularly described below.

9.     This Court has personal jurisdiction over Defendants OW UK and OW Supply pursuant to the standard OW Bunker Group Terms and Conditions, a copy of which is attached hereto as **Exhibit 1.**[1] Additionally, these OW entities continuously and systematically conduct business and/or transact business in the United States as to the supply of marine bunkers to vessels for purposes of jurisdiction under Fed R. Civ. P. 4(k) and 28 U.S.C. §2361.

10.     This Court has personal jurisdiction over Defendant OW USA pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure, as OW USA is a U.S.-based business entity and does continuous and systematic business throughout the United States. Additionally, this Court has jurisdiction over OW USA pursuant to the OW Terms and Conditions.

11.     This Court has personal jurisdiction over Defendant Chevron pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure, and also pursuant to New York CPLR §301, as Chevron is authorized to do and is doing business within the State of New York.

12.     This Court has personal jurisdiction over Defendant ING to the extent that it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute, and to the

---

[1] While Plaintiff maintains that these terms are not applicable to the purchases described herein, the OW entities and/or ING have asserted that these terms apply.

extent that it is an alleged assignee of the receivables of OW UK, OW Supply and OW USA. Alternatively, this Court has personal jurisdiction over ING pursuant to New York CPLR §301 as ING is engaged in continuous and systematic business within the State of New York through its New York subsidiary at 1325 Avenue of the Americas, New York, New York 10019.

13.    Venue is proper in this District under 28 U.S.C. §1397 and/or the OW Terms and Conditions.

**FACTUAL BACKGROUND**

14.    Canpotex is the time charterer/operator of the M/V GLOBAL PHOENIX, the M/V CMB GIULIA, and the M/V ASTON TRADER II (collectively the "Vessels"), and had all obligations with respect to the purchase and payment for the supply of bunkers to the Vessels.

15.    Effective Feb. 14, 2014, Canpotex entered into a Fixed Price Trading Agreement with OW Supply. As part of that agreement Schedule 3 included the Terms & Conditions of Sale for Marine Bunkers, which it was agreed would apply to both future fixed price and spot purchases from OW Supply and its affiliates and subsidiaries. A true and correct copy of that agreement is attached hereto as **Exhibit 2**

16.    The purchases for the following vessels were spot purchases.

**THE M/V GLOBAL PHOENIX**

17.    In or about October 2014, Canpotex ordered bunkers from OW UK (an apparent corporate affiliate of OW Supply) to be loaded onboard the M/V GLOBAL PHOENIX at the Port of Portland, Oregon. (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 3**).

18.    The bunkers were delivered to the GLOBAL PHOENIX on or about October 16, 2014, ostensibly by Chevron. (*See* Exhibit 3).

19.     In accordance with the established course of business, Canpotex was invoiced $410,691.96 for these bunkers by OW UK, not Chevron.

20.     On information and belief, Chevron invoiced its contracting counterparty, OW USA, for the bunkers supplied to the GLOBAL PHOENIX, but has not been paid and has therefore demanded that Canpotex remit payment directly to Chevron.

21.     Canpotex is unaware of whatever downstream arrangements may have existed with Chevron and its contracting counterparty, OW USA.

22.     Canpotex has made no payment with respect to the supply of bunkers to the GLOBAL PHOENIX, and competing claims have been or may be made by Defendants against Canpotex and/or that vessel asserting entitlement to the payment from Canpotex.  Threats have also been made to arrest the vessel.

### THE M/V CMB GIULIA

23.     In or about October 2014, Canpotex ordered bunkers from OW UK to be loaded onboard the M/V CMB GIULIA at the Port of Portland, Oregon. (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 4**).

24.     The bunkers were delivered to the CMB GIULIA on or about October 16, 2014, ostensibly by Chevron.  (*See* Exhibit 4).

25.     In accordance with the established course of business, Canpotex was invoiced $369,618.84 for these bunkers by OW UK, not Chevron.

26.     On information and belief, Chevron invoiced its contracting counterparty, OW USA, for the bunkers supplied to the CMB GIULIA, but has not been paid and has therefore demanded that Canpotex remit payment directly to Chevron.

27.     Canpotex is unaware of whatever downstream arrangements may have existed with Chevron and its contracting counterparty, OW USA.

28.     Canpotex has made no payment with respect to the supply of bunkers to the CMB GIULIA, and competing claims have been or may be made by Defendants against Canpotex and/or that vessel asserting entitlement to the payment from Canpotex. Threats have also been made to arrest the vessel.

## THE M/V ASTON TRADER II

29.     In or about October 2014, Canpotex ordered bunkers from OW UK to be loaded onboard the ASTON TRADER II at the Port of Portland, Oregon. (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 5**).

30.     The bunkers were delivered to the ASTON TRADER II on or about October 31, 2014, ostensibly by Chevron. (*See* Exhibit 5).

31.     In accordance with the established course of business, Canpotex would have been invoiced for this supply by OW UK; but Canpotex never received a formal invoice presumably due to the financial collapse of the OW entities. However, based upon the pricing reflected in the Sales Order Confirmation issued by OW UK to Canpotex and the quantity of bunkers delivered, Canpotex has calculated the amount due for these bunkers as being $332,041.95.

32.     On information and belief, Chevron invoiced its contracting counterparty, OW USA, for the bunkers supplied to the ASTON TRADER II, but has not been paid and has therefore demanded that Canpotex remit payment directly to Chevron.

33.     Canpotex has made no payment with respect to the supply of bunkers to the ASTON TRADER II, and competing claims have been or may be made by Defendants against

Canpotex and/or that vessel asserting entitlement to the payment from Canpotex. Threats have also been made to arrest the vessel.

## CAUSE OF ACTION - INTERPLEADER WITH RESPECT TO THE M/V GLOBAL PHOENIX, M/V CMB GIULIA AND M/V ASTON TRADER II

34.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-30, inclusive, as if fully set forth at length herein.

35.     On November 7, 2014, O.W. Bunker & Trading A/S and certain of its Danish subsidiaries and affiliates (including OW U.K.) filed for bankruptcy protection in their home jurisdiction of Denmark. Thereafter many other O.W. entities and/or affiliates filed for bankruptcy protection in various jurisdictions around the world.

36.     On December 12, 2014, Charles MacMillan of Beever and Struthers was appointed the Administrator of OW UK. On January 16, 2015, the Administrator advised that it had entered into a Co-operation Agreement with ING for the collection of receivables assigned to ING, demanded full payment for the bunkers supplied, and instructed that all amounts should be paid to the ING account set out on the OW UK invoices.

37.     In addition, and as explained above, Chevron has claimed its entitlement to be paid for the same bunkers for which full payment is being pursued by ING on behalf of OW UK.

38.     Under the circumstances, there are various competing interests for the amounts due and owing by Canpotex for the bunkers supplied to the GLOBAL PHOENIX, CMB GIULIA and ASTON TRADER II, including but not limited to claims by the various OW entities, ING as purported assignee and/or secured party of the OW entities, all of whom have asserted the right to receive payment in full for the single supply of bunkers to each Vessel.

39.     Canpotex is unsure of which party to pay for the bunkers supplied to the Vessels and accordingly has not made any payments to anyone in response to the competing demands.

40.     Based on the foregoing, Canpotex, a disinterested stakeholder, has been and will be subject to multiple claims for payment for the bunkers supplied to the GLOBAL PHOENIX, the CMB GIULIA, and the ASTON TRADER II, and the interests of the Defendants in the property subject to this interpleader are adverse as there is a dispute as to which entity is entitled to payment from Canpotex for the bunkers.

41.     Canpotex has a reasonable fear of multiple liabilities because of these adverse claims including, but not limited to, the threat of *in rem* seizure of the Vessels or other property owned or operated by Canpotex.

42.     In accordance with 28 U.S.C. §1335(a)(1) and 28 U.S.C. §2361, Canpotex has deposited funds covering and securing the indebtedness to the appropriate party (once determined by the Court), and is therefore entitled to relief in the form of: (a) an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for payment for the bunkers supplied; (b) an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supplies of the bunkers at issue in this action, including but not limited to arrest, attachment or other restraint of the Vessels or any other property of Canpotex; and (c) ultimately, an order determining the party or entity to which payment should be made and discharging Canpotex and the Vessels from any liability after payment is effected to the party or entity so designated by the Court to receive the payment for the supply of the bunkers to the Vessels.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Canpotex respectfully prays that the Court:

1.      Issue process in due form to the Defendants citing them to appear and answer the complaint, failing which a default can be taken;

2.      Approve the cash deposit tendered by Canpotex;

3.      Issue an immediate order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action or proceeding anywhere by the Defendants (or any number of them) to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessels GLOBAL PHOENIX, CMB GIULIA and ASTON TRADER II or any other property of Canpotex or the owners of the Vessels or any other entity within the same management;

4.      Direct the Defendants to file their claims for payment related to the supply of bunkers to these vessels in these proceedings for the Court to adjudicate the proper entity to which payment is due; and

5.      Declare, upon such determination and payment, as secured by the bond, that Canpotex and the Vessels are discharged from all liability with respect to the supply of the bunkers as to all other parties and entities; and

3.      That Canpotex be awarded such other and further relief which this Court may deem just and proper including but not limited to the attorneys fees and costs to which Canpotex is entitled under the relevant statutes.

Dated: New York, NY
July 13, 2015

Respectfully Submitted,

Gina M. Venezia
Peter J. Gutowski
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (Fax)
*Attorneys for Plaintiff,*
*Canpotex Shipping Services Limited*

# EXHIBIT 1

# OW BUNKER GROUP

Terms and Conditions of sale for Marine
Bunkers
Edition 2013

## A. GENERAL INTRODUCTION

**A.1** This is a statement of the terms and conditions according to which the International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

**A.2** These conditions apply to all offers, quotations, orders, agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

**A.3** General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

**A.4** In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

## B. DEFINITIONS

**B.1** Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |

## C. OFFERS, QUOTATIONS AND PRICES.

**C.1** An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the GTC are considered a part of the Confirmation.

**C.2** Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall only bind the Seller upon the Sellers' broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be.

**C.3** The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax, assessment, duty or other charge of whatever nature and however named, or any increase of components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4   All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5   If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6   The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7   If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.

D.   SPECIFICATIONS (QUALITY – QUANTITY)

D.1   The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2   The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum.

D.3   Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4   In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5   Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

E.   MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E.1   The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2   The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3      Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4      The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any ''No-lien'' clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5      In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

## F.      SAMPLING

F.1      The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2      In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3      The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4      Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5      In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6      The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7      No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8      Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms, Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.  DELIVERY**

G.1    The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2    The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3    The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilots, port- or other authorities.

G.4    In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5    The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6    The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7    If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8    The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9    The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10   The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11   In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12   Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13  If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14  The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15  If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16  In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

G.17  For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration, Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18  Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded.


H.     TITLE

H.1  Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2  Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3  In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4  In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5  The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6  Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7      For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.


I.       PAYMENT – MARITIME LIEN

I.1      Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2      Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3      (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4      Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5      Any delay in payment of the full sum due shall entitle the Seller to interest at, the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6      Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7      All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8      The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9     Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof, including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10    It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.      CLAIMS

J.1     In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2     Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3     The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4     The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5     In each and every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.     LIABILITY -- LIMIT TO SELLER'S LIABILITY

K.1     The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2     Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3　　The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4　　No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.

## L.　　EXEMPTIONS AND FORCE MAJEURE

L.1　　Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fall in whole or in part as a result of the causes set out in this Article at any later time.

L.2　　If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3　　Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3　　In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4　　(a)　　These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

(b)　　Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

(i)　　A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

(ii)　　Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

(iii)　　A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c) It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

## M. BREACH/CANCELLATION

M.1 Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

  a) when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

  b) when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

  c) when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

  d) when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2 The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3 The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

  a) The Vessel; or
  b) The Charterer of the Vessel; or
  c) The fully or partly Owner(s) of the Vessel; or
  d) Any officers of the Vessel; or
  e) The Operator and/or Manager of the Vessel; or
  f) Any other person or entity in any way related to the Agreement or delivery is/are
  1) Iranian(s); or
  2) Related in any way to Iran or Iranians; or
  3) Listed on the US OFAC Specially Designated Nationals List; or
  4) Covered by any US, UN- and/or EU sanctions; or
  5) Covered by any sanctions of any other jurisdiction and/or administration.

  Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

  The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4 The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act. Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

## N. SPILLAGE, ENVIRONMENTAL PROTECTION

N.1 If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generally of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O. DELAYS AND CANCELLATIONS

O.1    Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2    If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P. LAW AND JURISDICTION

P.1    This Agreement shall be governed and construed in accordance with English law.
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2    In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the "LLMA"). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3    Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4    In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5    The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6    If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

## Q.    VALIDITY

Q.1    These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2    These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# EXHIBIT 2

## GENERAL TERMS FOR FIXED PRICE TRADING

BETWEEN

O.W. Supply & Trading A/S
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
(the "Seller")


AND

Canpotex Shipping Services Limited
24-725-4931
P O Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, SK  S7K 3R7
(the "Buyer")


( each a **"Party"** in the singular and the **"Parties"** in the plural)


Dated       February 14th 2014 (the **"Effective Date"**)

**INDEX**

PART I – FIXED PRICE TERMS                                    3

1      General                                                3

2      Effectiveness of these Terms                           4

3      Delivery                                               4

4      Payment                                                5

5      Assignment                                             7

6      Confidentiality                                        7

7      Failure to take delivery                               7

8      Termination for cause (breach)                         8

9      Conditions Precedent                                   11

10     Expenses                                               11

11     Force Majeure                                          11

12     Notices                                                12

13     Entire agreement                                       13

14     Law and jurisdiction                                   14

15     Definitions                                            14

16     Signature                                              16

**PART I – FIXED PRICE TERMS**

1.  **General**

1.1  The Buyer and the Seller have entered and/or anticipate entering into one or more transactions (each a **Transaction**) that are or will be governed by these General Terms for Fixed Price Trading (the **Terms**), which include (i) the documents and other confirmation evidence in the form set out in Schedule 1 (each a **Confirmation**) exchanged between the parties confirming those Transactions, (ii) Schedule 2 (*Credit Support Annex*), pursuant to which margin may be required to be delivered by the Buyer to cover the Seller's exposure to the Buyer, and (iii) Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*).

1.2  A Transaction may be entered into and/or modified orally (including by telephone) and/or in writing by letter, facsimile and/or electronic data transfer.

1.3  As soon as practicable after the entering into a Transaction the Parties will exchange and execute a Confirmation setting out the agreed terms of such Transaction. The failure to prepare and/or execute a Confirmation shall not affect the validity of a Transaction.

1.4  Under each Confirmation the Seller agrees to sell and deliver, and the Buyer agrees to buy and take delivery of the relevant products specified therein at the price set out in the relevant Confirmation.

1.5  In the event of any inconsistency between the provisions of any Confirmation, Schedule 2 (*Credit Support Annex*), Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*) and the other provisions of these Terms, the documents will prevail in the following order: (i) any Confirmation; (ii) these Terms; (iii) Schedule 2 (*Credit Support Annex*); and (iv) Schedule 3 (*Terms and Conditions of sale for Marine Bunkers*).

1.6  The Buyer acknowledges that each Transaction under these Terms has been entered into for the purpose of receipt and delivery in accordance with the Buyer's own expected usage requirements.

2.   **Effectiveness of these Terms**

2.1   These Terms shall come into effect on the Effective Date and shall remain in effect for a term of five (5) years thereafter.

2.2   These Terms will automatically renew for consecutive two (2) years unless terminated by either Party upon prior thereto giving one-hundred eighty (180) days' prior written notice to the other Party.

2.3   For the avoidance of doubt, neither Party shall be under any obligation to enter into any Transaction hereunder simply because of the existence and effectiveness of these Terms.

3.   **Delivery**

3.1   Following delivery of a Receipt from the Seller, the Seller shall, subject to section 3.6 below, be obliged (either itself, through an Affiliate of the Seller or through any other supplier delivering on the Seller's behalf) to deliver, and the Buyer (or, if specified in the Nomination, the Buyer's Affiliate) shall be obliged to take delivery of, the total volume specified in the Nomination at the port specified in the Nomination, provided that if the Buyer has specified a port for delivery which is different from the Base Port in the Nomination, the Seller may, in its sole discretion, refuse to deliver a Receipt in respect of such Nomination.

3.2   The Buyer shall, in the last month of the Delivery Period, take delivery of the remaining Total Volume.

3.3   The Seller (or any Affiliate or supplier acting on behalf of the Seller) shall inform the Buyer (or the agent specified by the Buyer) of the exact time and date for delivery.

3.4   If the delivery is made to any Affiliate of the Buyer, the Buyer shall remain liable as principal obligor of the obligations of such Affiliate and the Seller shall be entitled to arrest, levy execution on and subsequently sell the vessel which has taken the delivery irrespective of whether such vessel belongs to the Buyer or any Affiliate of the Buyer.

3.5     Delivery shall take place in accordance with the terms set out in Schedule 3
        (Terms and conditions of sale for Marine Bunkers).

3.6     If the total volume specified in the Nomination is not available in the port
        specified in the Nomination, the Seller shall use its best endeavours to deliver
        replacement products, provided that any such failure to deliver the total volume
        specified in the Nomination shall not constitute a breach of the Seller's
        obligations under these Terms and the Seller shall have no liability to the Buyer
        or any other party under these Terms as a result of such failure to deliver.

4.      **Payment**

4.1     With respect to each Transaction where delivery is in the Base Port, the Buyer
        owes to the Seller on the date of delivery an amount equal to the sum of (i) the
        Price multiplied by the requested volume; and (ii) any Related Delivery Costs.

4.2     With respect to each Transaction where the Seller agrees, in accordance with
        section 3.1 and following an Other Port Nomination Notice from the Buyer, that
        delivery shall be in a port other than the Base Port, the Buyer shall pay the
        Seller an amount equal to the sum of: (i) the Price multiplied by the requested
        volume(s); (ii) any Related Delivery Costs; (iii) the Port Differential multiplied
        by the requested volume(s); (iv) if the specified product(s) in relation to the
        Transaction are unavailable in the specified port and the Seller and Buyer agree
        upon the delivery of a replacement product, the Product Differential multiplied
        by the requested volume(s); and (v) Other Port Costs.

        For the purposes of this section 4.2:

                **Other Port Costs** means all costs and expenses (including but not limited
                to any taxes) incurred by the Seller as a consequence of the Buyer's
                nomination of delivery in a port other than the Base Port, as calculated by
                the Seller acting in good faith and in a commercially reasonable manner.

                **Port Differential** means a price differential expressed as an amount
                (which may be positive or negative), as calculated by the Seller acting in
                good faith and in a commercially reasonable manner, between the Base
                Port and the specified port based on (i) the date of the Seller's agreement

with the supplier(s) which is/are to deliver the nominated volume in the other port; (ii) the price listed for the specified product(s) in relation to the Transaction in the Base Port Index on such date; and (iii) the price listed for the specified product(s) in relation to the Transaction and port in the Marine Fuel Price Index on such date, or if the Marine Fuel Price Index does not contain any prices for the port specified in the nomination, the actual price obtained from the supplier.

**Product Differential** means a price differential expressed as an amount (which may be positive or negative), as calculated by the Seller acting in good faith and in a commercially reasonable manner, between the product(s) in relation to the Transaction and any replacement products based on (i) the date of the Seller's agreement with the supplier(s) which is/are to deliver the replacement product(s) in the other port; (ii) the price listed for the relevant product(s) in the Base Port Index on such date; and (iii) the price listed for the relevant replacement product(s) and port in the Marine Fuel Price Index on such date, or if the Marine Fuel Price Index does not contain any prices for the replacement product(s) agreed upon between the Parties the actual price obtained from the supplier in relation to such product(s).

The total amount payable under this section 4 shall become due and payable on the date of delivery, or, if the Buyer has not been notified about the amount of the payment obligation, on the date the Buyer receives such notification. The Buyer shall satisfy its obligation to pay such amount by either (i) having an amount deducted from its available credit lines with the Seller (if any, made available by the Seller to the Buyer from time to time in relation to Transactions under these Terms), or (ii) paying an amount to the Seller on the date of delivery, provided that it will be possible for the Buyer to satisfy its obligation under this clause by a combination of (i) and (ii) above.

4.3     Any payment made pursuant to these Terms shall be made without any deduction, set-off or counterclaim. If the Buyer is required by law to make any deduction or withholding for tax from any payment to be made pursuant to these Terms, the amount due shall be increased to the extent necessary to ensure that the Seller receives the full amount due notwithstanding any such

deduction or withholding, unless such deduction or withholding of tax would not have been imposed in respect of the payment but for a connection between the jurisdiction of the taxation authority imposing such tax and the Seller.

4.4     All payments shall be made in USD unless the Parties agree otherwise in writing.

4.5     If the Buyer fails to make any payment in accordance with this section 4, interest shall accrue (before as well as after judgment) on the overdue amount for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Overdue Payment Interest Rate. Any such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

5.      Assignment

5.1     A Party may not assign or transfer any of its rights and/or obligations under these Terms to any third party without the prior written consent of the other Party, except: (i) to an Affiliate; or (ii) a Party may transfer all or any part of its interest in any Early Termination Amount payable to it by a breaching Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest.

6.      Confidentiality

6.1     The Parties shall keep all matters in relation to these Terms confidential including, but not limited to, the existence of these Terms. The aforesaid shall, however, not prevent the Parties from disclosing information: (i) when required by law; (ii) when part of obtaining advice from external advisors subjected to an obligation of confidentiality; or (iii) when part of communications between a Party and its Affiliates.

6.2     The above section 6.1 shall continue to apply after the expiry of these Terms irrespective of the reason for such expiration.

7.      Failure to take delivery

7.1 If the Buyer fails to: (i) take delivery of any volume nominated in accordance with these Terms at the agreed date and time; or (ii) take delivery, unless otherwise agreed, of the total volume nominated in respect of a Transaction during the then current month, such volume not delivered (the **Undelivered Volume**) shall be cash settled in accordance with this section 6.

7.2 The **Cash Settlement Amount** shall be calculated as the Undelivered Volume multiplied by the **Price Differential**. The Price Differential shall be an amount equal to (i) the price for the specified product(s) in relation to the Transaction listed in the Base Port Index for the Base Port (a) in respect of section 7.1 (i), at a date between the delivery date and the second Business Day thereafter (both days included) chosen by the Seller in its sole discretion and (b) in respect of section 7.1(ii), at a date between the last day of the relevant month and the second Business Day thereafter (both days included) chosen by the Seller in its sole discretion, minus the Price for the specified product(s) in relation to the Transaction or the quoted price where the Buyer has accepted such a price in relation to any given volume. If the Cash Settlement Amount is a positive number the Seller shall pay such amount to the Buyer. If the Cash Settlement Amount is a negative number the Buyer shall pay the absolute value of such amount to the Seller.

7.3 In addition, the Buyer shall pay any other direct losses or costs (**Other Costs**) that have been incurred by the Seller as determined by the Seller acting in good faith and in a commercially reasonable manner not included in the definition of Cash Settlement Amount (such as, but not limited to, hedging costs or loss of profit) as a consequence of its failure to take delivery.

7.4 On or as soon as reasonably practicable following the date of the calculation of the Cash Settlement Amount in accordance with section 7.2, the Seller shall notify the Buyer in writing of the Cash Settlement Amount and any amounts due from the Buyer under section 7.3.

7.5 The Cash Settlement Amount and the Other Costs shall be paid by the Seller or the Buyer, as the case may be, no later than two (2) Business Days after the Seller provides the Buyer with the statement of the amount to be paid.

8. **Termination for cause (breach)**

8.1 All (but not some) outstanding Transactions may be terminated for cause if a Party has committed: (i) a material breach which is not cured within five (5) Business Days after the Party in breach has received a written notice demanding remedy of such breach; or (ii) a non-material breach which is not cured within thirty (30) Business Days after the Party in breach has received a written notice demanding remedy of such breach.

8.2 Following any breach which has not been cured within the periods set out in section 8.1, the non-breaching Party may, by notice to the breaching Party, designate a day not earlier than the day such notice is effective as an early termination date (the **Early Termination Date**) in respect of all outstanding Transactions.

8.3 Without prejudice to the other provisions of these Terms, upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under these Terms in respect of any outstanding Transactions will be required to be made.

8.4 The amount, if any, payable in respect of an Early Termination Date (the **Early Termination Amount**) will be an amount equal to (i) the sum of (a) the Close-out Amount (whether positive or negative) determined by the Seller for all Transactions and (b) all Unpaid Amounts owing to the non-breaching Party less (ii) all Unpaid Amounts owing to the breaching Party. If the Early Termination Amount is a positive number, the breaching Party will pay it to the non-breaching Party; if it is a negative number, the non-breaching Party will pay the absolute value of the Early Termination Amount to the breaching Party.

8.5 For the purposes of these Terms, **Close-out Amount** means the amount of the losses or costs of the non-breaching Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the non-breaching Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the non-breaching Party the economic equivalent of (a) the material terms of those terminated Transactions, including the payments and deliveries by the Parties under these Terms that would, but for the occurrence of the Early Termination Date, have been required after that date and (b) the option rights of the parties in respect of the terminated Transactions, provided that where

there are two non-breaching Parties, each Party will determine a Close-out Amount in relation to the terminated Transactions and the Close-out Amount will be the sum of one-half of the difference between the higher amount so determined and the lower amount so determined, provided that any positive amount shall be higher than any negative amount and, where two negative amounts are compared, the smaller negative number shall be higher than the larger negative number.

8.6 Without duplication of amounts calculated based on section 8.5 above, the Buyer shall furthermore pay any other losses or costs incurred by the Seller (such as, but not limited to, hedging costs or loss of profit) as a consequence of any breach by the Buyer as determined by the Seller acting in good faith and in a commercially reasonable manner.

8.7 Any Close-out Amount will be determined by the Seller (or its agent), acting in good faith and using commercially reasonable procedures in order to produce a commercially reasonable result. The Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

8.8 All amounts owed by a Party shall be paid on the Early Termination Date irrespective of any date of maturity and/or payment date otherwise set out in these Terms.

8.9 Any Early Termination Amount payable to one party (the **Payee**) by the other party (the **Payer**), will, at the option of the non-breaching Party (**X**) (and without prior notice to the breaching Party, as the case may be), be reduced by its set-off against any other amounts (**Other Amounts**) payable by the Payee to the Payer (whether or not arising under these Terms, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 8.9.

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in

which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this section 8.9 will be effective to create a charge or other security interest. This Section 8.9 will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

9.    **Conditions Precedent**

9.1    Each obligation of each Party to make any payment or delivery under these Terms is subject to the condition precedent, that no material breach or potential material breach with respect to the other Party has occurred or is continuing. For the purpose of these Terms, a potential material breach shall mean any event which by notice and/or the lapse of time, would constitute a material breach of these Terms.

10.    **Expenses**

10.1    Following a failure to take delivery of Total Volume pursuant to section 7.1, the Buyer or, following a breach pursuant to section 8, the breaching Party, will on demand indemnify and hold harmless the other Party for and against all reasonable out-of-pocket expenses, including, but not limited to legal fees, execution fees and stamp taxes, incurred by such other Party by reason of the enforcement and protection of its rights under these Terms or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

11.    **Force Majeure**

11.1    Both Parties are excused from the performance of their obligations under these Terms if a force majeure event in respect of either Party occurs and is continuing. Such obligations shall not be extinguished but, subject to section 11.5, shall be suspended until the force majeure event is no longer continuing, when such obligations shall be required to be satisfied within five (5) business days.

11.2    The determination of whether an event should be deemed to constitute an event of force majeure shall be based on the applicable law. Notwithstanding the aforesaid the following events shall always be deemed to constitute an event of force majeure if they would prevent any delivery or payment under these Terms:

War, flood, lightning, drought, earthquake, embargo, fire, volcanic eruption, landslide, hurricane, cyclone, typhoon, tornado, explosion, civil disturbance, act of God or the public enemy, terrorist act, military action, epidemic, famine or plague, shipwreck, action of a court or public authority or restraint of princes or rulers; each on an industry wide, region-wide or nationwide basis.

11.3    Notwithstanding anything to the contrary in the previous sections of this section 11 an embargo against Iran shall always be deemed to prevent the Seller from making deliveries in the Base Port if the Base Port is in Iran or the United Arab Emirates.

11.4    A force majeure event shall be deemed to have occurred in relation to the Seller to the extent that such an event occurs in relation to the Seller's suppliers and has a material effect on the Seller's ability to perform its obligations under these Terms and that the event cannot be mitigated by the Seller by using reasonable efforts (which will not require the Seller to incur a loss, other than immaterial, incidental expenses). .

11.5    If the force majeure event continues for more than 180 days all Transactions under these Terms will be terminated under section 8 with both Parties as non-breaching Parties.

12.    **Notices**

12.1 Each Party giving or making any notice, request or demand or other communication pursuant to these Terms shall give such notice in writing to the notice details of the other Party listed below and use one of the following methods of delivery, each of which for the purposes of these Terms is in writing and will be deemed effective as indicated:

**O.W. Supply & Trading A/S**
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
Att.: Risk Management
Email: hedging@owbunker.com
Facsimile: + 45 70 26 52 77

**Canpotex Shipping Services Limited**
24-725-4931
P.O. Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, SK  S7K 3R7
Attn: Senior Vice President, Operations
Email: scott.rudderham@canpotex.com
Facsimile: 306.653.5505

(i)   if delivered by hand, on the date it is delivered;

(ii)  if sent by registered or certified mail (in each case, return receipt requested and postage paid), on the date it is delivered or its delivery is attempted;

(iii) if sent by nationally recognised overnight courier (with all fees paid), on the date it is delivered or its delivery is attempted;

(iv)  if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); or

(v)   if sent by e-mail, on the date it is received.

13.   **Entire agreement**

13.1    These Terms, the Terms and Conditions for Marine Bunkers and the Annex
        constitute the entire agreement and understanding of the Parties with respect
        to its subject matter. Each of the Parties acknowledges that in entering into
        these Terms it has not relied on any oral or written representation, warranty or
        other assurance (except as provided for or referred to in these Terms) and
        waives all rights and remedies which might otherwise be available to it in
        respect thereof.

14.     **Law and jurisdiction**

14.1    These Terms, and any non-contractual obligations arising in connection with
        these Terms, will be governed and construed in accordance with English law.

14.2    Any dispute arising in connection with these Terms or any agreement relating
        hereto (including any dispute arising in relation to the Credit Support Annex
        and/or the Terms and Conditions of sale for Marine Bunkers) shall be finally
        settled under the rules of the London Maritime Arbitrators Association by one or
        more arbitrators appointed in accordance with such rules. The site of arbitration
        shall be London and the Arbitration award pronounced thereby will be final,
        conclusive and binding on both the parties hereto.

15.     **Definitions**

15.1    As used in these Terms:

        *Affiliate* in relation to a Party means any corporation, partnership or other entity
        or association that directly or indirectly through one or more intermediaries own or
        control or is controlled by or is under common control with that Party;

        *Base Port Nomination Notice* has the meaning set out in the relevant
        Confirmation;

        *Basis Volume* means, in respect of each product in relation to a Transaction, the
        basis volume as specified in the Confirmation;

**Business Day** means: (a) for payments any day on which banks are open for general commercial business in the city where such payment is to be made; and (b) for deliveries any day on which the relevant Port is open for general business;

**month** means a calendar month;

**Monthly Volume** means the sum of (i) the Basis Volume of the calendar month subject to any Volume Deviance invoked by the Buyer in respect of that calendar month and (ii) the Volume Deviance (if any) of the previous calendar month;

**Nomination** means an irrevocable nomination sent by the Buyer to the Seller by fax or e-mail specifying: (i) Transaction(s); (ii) volume(s); (iii) delivery date; (iv) vessel name; (v) agent; (vi) delivery port; and (vii) details of the Buyer's Affiliate (if any) taking delivery.

**Other Port Nomination Notice** has the meaning set out in the relevant Confirmation;

**Overdue Payment Interest Rate** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum, or such other rate as set out in the relevant Confirmation;

**Receipt** means a copy of the Nomination returned by the Seller in its sole discretion to the Buyer as confirmation and acceptance of the terms set out in the Nomination.

**Related Delivery Costs** means delivery costs and charges including, but not limited to, any barging, overtime, tugs and/or pipeline charges, provided that the Seller will use reasonable efforts to reduce such costs and charges to the extent that such costs and charges are deemed to be negotiable;

**Unpaid Amounts** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all terminated Transactions, the amounts that became payable (or that would have become payable but for section 9) to such party on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each terminated Transaction, for

each obligation which was required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other compensation in respect of that obligation or deferred obligation, as the case may be. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the Seller;

*USD* means the lawful currency of the United States of America; and

*Volume Deviance* means an increase or decrease of the Monthly Volume not exceeding 5% of such Monthly Volume following notice of such deviance from the Buyer to the Seller

**Signature**

15.2 IN WITNESS whereof, the Parties have agreed to these terms executed as at the Effective Date.

For the Seller: Ø.W. Supply & Trading A/S
Signature: _____
Print Name: Jane Dahl Christensen
Capacity: EVP


For the Buyer: Canpotex Shipping Services Limited

Signature: _____
Print Name: Scott E. Ruddenham
Capacity:   Senior Vice President, Operations

Signature: _____
Print Name: Ted J. Nieman
Capacity: Senior Vice President, General Counsel and Secretary

## SCHEDULE 1

### Form of Confirmation

The purpose of this letter (the "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below.

This Confirmation constitutes a **Confirmation** as referred to in, and supplements, forms part of and is subject to, the General Terms for Fixed Price Trading dated as of February 14th 2014, (the **Terms**) between Canpotex Shipping Services Limited (the **Buyer**) and O.W. Supply & Trading A/S (the **Seller**). All provisions contained in the Terms govern this Confirmation except as expressly modified below.

| | |
|---|---|
| Product(s) | Product 1: [insert]; and<br>Product 2: [insert]; and<br>Product 3: [insert]. |
| Total Volume | [insert] m.t. of Product 1; and<br>[insert] m.t. of Product 2; and<br>[insert] m.t. of Product 3.<br>The abbreviation "m.t." stands for metric tonnes |
| Basis Volume per month | [insert] m.t. of Product 1; and<br>[insert] m.t. of Product 2; and<br>[insert] m.t. of Product 3. |
| Price | USD [insert] per m.t. of Product 1; and<br>USD [insert] per m.t. of Product 2; and<br>USD [insert] per m.t. of Product 3. |
| Delivery Period | from [ ] to and including [ ] |
| Base Port | [ ] |
| Minimum Volume per delivery | [ ] m.t. |
| Maximum Volume per delivery | [ ] m.t. |
| Base Port Nomination Notice | [ ] days |
| Other Port Nomination Notice | [ ] days |
| Marine Fuel Price Index | [ ] |
| Base Port Index | [ ] |

| | |
|---|---|
| Payment Term | [ ] days<br><br>*The Payment Term is granted only to the extent that the Buyer's total outstanding debts at any given time are below the credit line. The latter is determined by the Seller and may at any given time be changed by the Seller in its sole discretion in accordance with the General Terms for Fixed Price Trading.* |
| Overdue Payment Interest Rate | [ ] |
| General Terms for Marine Fuel Delivery | [ ] |

Please confirm that the above correctly sets out the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning to us or by sending to us a letter substantially similar to this letter, which letter sets out the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms

Yours sincerely

For the Seller:

Signature:  _____

Print Name:     [insert]
Capacity:        [insert]


Confirmed as of the dated first above written:

For the Buyer:

Signature:  _____

Print Name. [insert]
Capacity:     [insert]

# SCHEDULE 2

# CREDIT SUPPORT ANNEX

BETWEEN

O W  Supply & Trading A/S
17729071
Stigsborgvej 60
9400 Noerresundby, Denmark
Att  Risk Management
(the "OW")

AND

Canpotex Shipping Services Limited
24-725-4931
P O  Box 1600
Suite 400  11 2nd Avenue South
Saskatoon  SK S7K 3R7
Att  Scott E  Rudderham  Senior Vice President  Operations
(the "Counterparty")


(each a "Party" in the singular and the "Parties" in the plural)

**INDEX**

| | | |
|---|---|---|
| 1. | BACKGROUND | 3 |
| 2. | THRESHOLD AND ELIGIBLE CREDIT SUPPORT | 3 |
| 3. | MARGIN CALLS – EXPOSURE | 4 |
| 4. | TRANSFERS | 5 |
| 5. | INTEREST AMOUNT | 6 |
| 6. | NOTICES | 7 |
| 7. | DEFAULT | 7 |

## 1. BACKGROUND

1.1 OW and the Counterparty have entered and/or may enter into one or more fixed price agreements regarding the delivery of marine fuel at a fixed price, which transactions (**"Transactions"**) shall be governed by the General Terms for Fixed Price Trading (**"GT for Fixed Price"**) entered into between the Parties on or about the date of this Credit Support Annex (this **"Annex"**).

1.2 This Annex supplements, forms part of and is subject to GT for Fixed Price and for purposes of the GT for Fixed Price.

## 2. THRESHOLD AND ELIGIBLE CREDIT SUPPORT

2.1 For purposes of Clause 3 **"Threshold"** means:

- with respect to Counterparty: USD 1,000,000

- with respect to OW: USD 1,000,000

The Threshold applies to the total amount of unsecured exposure (as defined in Clause 3.4 below) granted to the Counterparty under all agreements which this Annex supplements, forms part of and is subjected to. Thus multiple references to the Annex in different, independent agreements do not grant the Counterparty multiple Thresholds.

"Minimum Transfer Amount" means

- USD 200,000

The Threshold and the Minimum Transfer Amount for each of the Parties are agreed on the basis of an evaluation of the creditworthiness of the Parties at the time of execution of this Annex. If a Party (**"X"**) at any time on the basis of a renewed evaluation of the creditworthiness of the other Party (**"Y"**) deems it necessary in its sole discretion to reduce the Threshold and/or the Minimum Transfer Amount of Y, X shall be entitled to do so upon written notice to Y with immediate and retrospective effect in relation to Transactions already entered into as well as with immediate and prospective effect in relation to any future Transactions entered into. The Threshold and/or the Minimum Transfer Amount, as applicable, of X shall be subject to the same reduction(s) as the reduction(s) imposed on Y.

2.2     For purposes of Clause 3

        "**Eligible Credit Support**" means with respect to Counterparty and OW:

        -    Cash in USD

        and "**Equivalent Credit Support**" means, in relation to any Eligible Credit Support, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

**3.     MARGIN CALLS – EXPOSURE**

3.1     If at any time the Exposure (as defined below) of a Party (the "Transferee") under the Transactions (less any value already held as Credit Support by the Transferee pursuant to this Clause 3) exceeds the Threshold for such Party (such excess amount referred to as the "**Excess Amount**"), the Transferee shall be entitled to demand by written notice (i.e. a margin call), that the other Party (the "Transferor") transfers to it Eligible Credit Support with a value equal to the Excess Amount (the "**Delivery Amount**") as credit support (the "**Credit Support**"). If the value of the Credit Support held by the Transferee pursuant to this Clause 3 at any time exceeds the Excess Amount, the Transferor may demand by written notice to the Transferee that the Transferee transfers to it Equivalent Credit Support with a value equal to the excess Credit Support (the "**Return Amount**"). If at any time, the Exposure of the Transferee is reduced to less than the Threshold for such Party, the Transferor may demand by written notice that the Transferee transfers Equivalent Credit Support equal to the value held as Credit Support pursuant to this Clause 3 (in which case the provision below on minimum transfer amount shall not apply).

3.2     A demand pursuant to Clause 3.1 shall be made no later than at 1pm (CET) on a business day to be deemed received on such date; otherwise it will be deemed received on the following business day.

3.3     The Delivery Amounts and the Return Amounts will be rounded up or down, as applicable, to the nearest USD $5,000. The Parties agree that demands for Delivery Amounts and Return Amounts may only be made if the Delivery Amounts or Return Amounts exceeds the Minimum Transfer Amount.

3.4     "**Exposure**" means with respect to a Party on any given date, the amount that would have been payable to such Party by the other Party (expressed as a positive number) less the amount, which would have been payable by that Party to the other Party (expressed as a negative number) under the Transactions if all the Transactions were

being terminated and cash settled on such date. Such Exposure will be calculated by OW in good faith and in a commercially reasonable manner based on mark to market values, and the Exposure may be calculated on a daily basis or as OW otherwise may deem fit in its sole discretion. All calculations and determinations shall be made in USD and are subject to review by Counterparty. Both Parties agree to use their best efforts to resolve expeditiously any disagreement concerning such calculations and determinations. If the Parties cannot agree on such calculation or determination they agree to appoint expeditiously and jointly an independent dealer in the instruments or obligations, to make such calculation or determination, with the calculation or determination made by such independent dealer to be binding and conclusive absent manifest error. Any disagreement with regards to the calculation of the Exposure cannot be invoked as a reason for withholding a demand for transfer of an amount. If it is subsequently determined by way of settlement or legal action that the calculation of the Exposure was erroneous the difference shall be transferred to the relevant Party in accordance with the terms applicable to an Excess Amount.

4.      **INITIAL MARGIN**

4.1     If the Parties have agreed at the time of entering into a Transaction that initial margin in the amount agreed between the Parties (the "**Initial Margin**") shall apply to Counterparty relating to such Transaction, Counterparty (as Transferor) shall transfer to OW (as Transferee) Eligible Credit Support with a value equal to the Initial Margin (and irrespective of the Threshold and any Exposure of OW pursuant to Clause 3) in accordance with the provisions set out in this Annex.

4.2     If the notional quantity of the Transaction for which Initial Margin has been delivered, is settled in intervals during the term of the Transaction, Counterparty is entitled to demand by written notice to OW that the Initial Margin be reduced with a proportionate part each time such settlement has taken place, and accordingly, OW shall transfer to Counterparty Equivalent Credit Support equal to the value of such proportionate decrease of the Initial Margin as calculated by OW (the "**Initial Margin Return**").

4.3     For purposes of this Annex Eligible Credit Support delivered as Initial Margin shall constitute Credit Support, except that it shall not be taken into account when calculating the Excess Amount in Clause 3.1.

5.      **TRANSFERS**

5.1     Transfers of cash as Eligible Credit Support or Equivalent Credit Support, respectively, shall be made, unless explicitly agreed otherwise, with value to the

relevant bank account of the receiving Party (i) in case of Initial Margin or payment of option premium, within two (2) business days after entering into the relevant Transaction, and (ii) in other cases, within two (2) business days after receipt by Counterparty or OW, as applicable, of the demand from the other Party requesting such transfer. The relevant bank account shall be the USD bank account notified by a Party to the other Party from time to time.

5.2     The Parties agree that all transfers of Eligible Credit Support or Equivalent Credit Support shall be transfers of title to the relevant credit support, that the recipient shall be free to use and dispose of such credit support and that nothing herein shall be deemed to create a security interest in such Eligible Credit Support or Equivalent Credit Support.

## 6.     INTEREST AMOUNT

6.1     The Transferee will in respect of the preceding calendar month transfer to the Transferor an amount in USD equal to the interest for each day of such interest period on the principal amount of the cash portion of the Credit Support, cf. Clause 3, as determined by OW by multiplying the amount of cash on that day by the interest rate, set out below in Clause 6.2, and dividing it by 365 (the **"Interest Amount"**), to the extent that OW determines that a Delivery Amount would not be created or increased by the transfer. Such transfer of accrued interest shall be made not later than on the fifth business day of each calendar month to a bank account specified by the Transferor.

6.2     For purposes of Clause 6.1 the interest rate shall be 1 mth USD LIBOR minus 0,5 pct. p.a. For the purposes hereof, "1 mth USD LIBOR" means for any day, an interest rate per annum equal to the rate published as the 1 mth USD LIBOR that appears on Reuters Code "USD1MFSR=" for such day, or as published in another source mutually agreed by the parties (however, the Interest Rate cannot be below 0%).

## 7.     NOTICES

7.1     Each Party giving or making any notice, request or demand or other communication pursuant to this Annex shall give the notice in writing and use one of the following methods of delivery, each of which for purposes of this Annex is a writing:

(i)     Personal delivery;

(ii)    Registered or Certified Mail (in each case, return receipt requested and postage paid);

(iii)   Nationally recognized overnight courier (with all fees paid);

(iv)    Facsimile,

(v)    E-mail

7 2     Any Party giving a notice shall address the notice to the appropriate person at the receiving party at the address listed in Clause 12 (Notices) of the GT for Fixed Price or to another addressee or another address as designated by a Party in a notice pursuant to this section

7 3     Except as provided elsewhere in this Annex, a notice is effective only if the Party giving the notice has complied with section 7 1 and section 7 2

## 7.     DEFAULT

7 1     Any breach by a Party of its obligations as set out in this Annex, if such breach is not cured within five (5) business days after notice of such breach is given to the Party, shall constitute a material breach for the purposes of the GT for Fixed Price Any material breach shall entitle the other Party to exercise the remedies as such other Party may be entitled to under the GT for Fixed Price, the Transactions or applicable law

7 2     If an Early Termination Date (as defined in the GT for Fixed Price) is designated or deemed to occur in respect of all Transactions subject to the GT for Fixed Price an amount equal to the value of the Credit Support provided under Clause 3 a, respectively, on such Early Termination Date (including any Interest Amount(s) accrued but not transferred as at that date) as calculated by OW to a net amount, will be deemed to be an Unpaid Amount due to the relevant Transferor for purposes of the settlement provisions of the GT for Fixed Price For purposes of this Clause the value of Credit Support will be calculated as follows (i) with respect to cash, the face amount thereof

8

## Schedule 3
## Terms and Conditions of sale for Marine Bunkers

A.     GENERAL INTRODUCTION

A.1     This is a statement of the terms and conditions according to which the International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2     These conditions apply to all offers, quotations, orders, agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3     General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4     In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

B.     DEFINITIONS

B.1     Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner or Bareboat Charterer of the vessel; |

| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
|---|---|
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |

C.      OFFERS, QUOTATIONS AND PRICES

C.1     An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the GTC are considered a part of the Confirmation.

C.2     Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall only bind the Seller upon the Sellers' broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3     The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax, assessment, duty or other charge of whatever nature and however named, or any increase of components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give the Buyer prior notice of this effect within a reasonable time after the Seller becoming aware of the relevant circumstances.

C.4     All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise.

C.5     If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right to insist as a precondition of sale that a payment guarantee is provided by the Owner. Owner is specified in Clause B.1. The Seller shall have the right to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner.

D.      SPECIFICATIONS (QUALITY – QUANTITY)

D.1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. Buyer shall also assume sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed. Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2     The quality and quantity shall be as agreed between the Seller and the Buyer and correspond to the Seller's Order-Confirmation.

D.3     Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4     In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

E.      MEASUREMENTS

E.1     The quantities of bunkers shall be determined from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2     The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present it's tank calibration and ullage sounding records, which are considered to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3     Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4     Buyer expressly undertakes not to make any endorsement, complaint/ comment on the Bunker Delivery Receipt when presented for signature. In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, with full supporting vouchers, in writing within 10 (ten) days thereof, failing which, and/or making of any endorsement whatsoever on the Bunker Delivery Receipt, shall extinguish any claim by the Buyer, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.


F.      SAMPLING

F.1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2     In case that dripsampling is not available onboard barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3     The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this clause.

F.4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as

the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5 In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to clauses related hereto above in this Article, shall be deemed to be conclusive and final evidence of the quality of the product delivered. One, and only one, of the samples retained by Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which are to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6 The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present; and both parties shall have the right to appoint independent person(s) or institute(s) to witness seal breaking. No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.7 Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

G. DELIVERY

G.1 The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2 The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Article G.3.

G.3     Vessel shall be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges. Seller shall not be liable for any consequences or any time lost due to Buyer's Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, Seller shall not be obligated to deliver prior to the nominated date or spread of dates.

G.4     In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours notice, where the last notice must specify the exact place of delivery. The notices of delivery must be given to Sellers and the Seller's representatives/agents.

G.5     The Seller shall be entitled to deliver the Bunkers in special part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6     The Seller shall not be required to deliver any bunkers for export if any government permit required has not been obtained in due time before the delivery.

G.7     If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that it as a result thereof may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated supply among its customers in such a manner as it may determine most reasonable in its sole discretion.

G.8     The Vessel in question shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9     The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in a Supplier's opinion clear and safe berth or anchorage is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10    The Buyer's Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses, and in any way requested to assist barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery. During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are completely

checked and being ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.

Local further special requirements for receiving bunkers must be followed strictly by the receiving Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the awareness of such eventual additional requirements for safety reasons.

G.11    In the event that the Buyer's Vessel is not able to receive the delivery promptly, the Buyer is thereby in breach of Article G.8 above and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12    Delivery shall be deemed completed and all risk, including loss damage, deterioration, depreciation, evaporation or shrinkage to the Bunkers delivered shall pass to the Buyer from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form at a lower price than that applicable to the grade originally nominated by the Buyer. The Seller may use this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these terms.

G.14    The Buyer's Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified immediately after such test period has expired.

G.15    If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16    In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, such damage is to be dealt with by the Owners directly of the involved units, and Seller/Supplier cannot be held responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

**H.        TITLE**

H.1        Title in and to the Bunkers delivered and/or property rights in and to such
           Bunkers shall remain vested in the Seller until full payment has been received
           by the Seller of all amounts due in connection with the respective delivery.

H.2        Until full payment of any amount due to the Seller has been made and
           subject to Article G.14 hereof, the Buyer shall not be entitled to use the
           Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell,
           encumber, pledge, alienate, or surrender the Bunkers to any third party or
           other Vessel.

H.3        In case of non or short payment for the Bunkers by the Buyerthe Seller is
           entitled to take back the Bunkers without prior judicial intervention, without
           prejudice to all other rights or remedies available to the Seller. Forthe
           avoidance of doubt the Buyer does not give any representation as to any
           conflicting rights of third parties.

H.4        In the event that the Bunkers have been mixed with other bunkers onboard
           the Vessel, the Seller shall have the right of lien to such part of the mixed
           Bunkers as corresponds to the quantity or net value of Bunkers delivered.

H.5        In case the Bunkers, in part or full, are no longer present or can no longer be
           identified or distinct from other Bunkers, the Seller has the right to arrest/attach
           the Vessel and/or sister ship and/or any other assets of the Buyer (or the
           Owner of the Vessel), cf. Clause C.5) wherever situated in the world without
           prior notice.

H.6        Where, notwithstanding these GTC's, title in and to the Bunkers delivered has
           passed to the Buyer and/or any third party before full payment has been
           made to the Seller, the Buyer shall grant a pledge over such Bunkers to the
           Seller. The Buyer shall furthermore grant a pledge over any other Bunkers
           present in the respective Vessel, including any mixtures of the delivered
           Bunkers and other bunkers. Such pledge will be deemed to have been given
           for any and all claims, of whatever origin and of whatever nature that the
           Seller may have against the Buyer.


**I.        PAYMENT**

I.1        Payment shall be made by the Buyer as directed by the Seller within the
           period agreed in writing.

I.2        Payment shall be made in full, without set-off, counterclaim, deduction
           and/or discount free of bank charges to the bank account indicated by the
           Seller on the respective invoice(s).

I.3        Notwithstanding any agreement to the contrary, payment will be due
           immediately in case of bankruptcy, liquidation or suspension of payment or
           comparable situation of the Buyer, or arrest of assets and/or claims of the

Buyer, or in case of any other situation, which in the sole discretion of the Seller, is considered to adversely affect the financial position of the Buyer.

I.4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5     Any delay in payment of the full sum due shall entitle the Seller to interest at, the rate of 2 (two) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.00 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 250.00 for each delivery made, and Seller holds the full right to involve internal and external legal assistance and to charge costs for same against Buyers.

I.6     Payments made by the Buyer shall at all times be credited in the following order: (1) costs, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7     All costs borne by the Seller in connection with the collection of overdue payments, whether made in or out of court and in general all costs in connection with breach of this agreement by the Buyer, shall be for the sole account of the Buyer.

I.8     The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the agreement. Failing immediate provision of such security upon Seller's demand, the Seller shall be entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9     While it is understood that the Buyer does not give any representation as to any conflicting rights of third parties, the Buyer accepts and agrees that until full payment has been received in Seller's bank/account the Seller holds a lien on the Bunkers onboard and in the Vessel itself.


J.      CLAIMS

J.1     In addition to the obligations referred to in Article E.4 above, any claim in connection with the quantity of Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or Vessel Master fails to present such immediate notice of protest to the Seller or

Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

Furthermore, any eventual changes or remarks made by Buyer or Buyer's Vessel, including a "No Lien" stamp or remark on the Bunker Delivery Receipt shall have no effect or value whatsoever and shall suffer the consequences set out in Article E.4 above.

J.2      Any and all claims concerning the quality of the bunkers delivered shall be submitted to the Seller in writing within 20 (twenty) days after delivery with a clear statement as to the nature or the claim(s) along with supporting documentation in support, failing any which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes. Also see Article G.14.

J.3      The Buyer shall be obliged to make payment in full (ref Article I.2 above) and fulfil all other obligations in accordance with the terms hereof, whether or not they have any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall use commercially reasonable efforts to obtain authorization from Owner to allow the herein stated steps and to provide all commercially reasonable assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. If the Buyer is in breach of its obligations according to this article such breach shall constitute a waiver of the Buyer's claim

J.4      In each and every case, any and all claims of the Buyer shall be time barred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Article P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the written Order Confirmation from the Seller.

## K.      LIABILITY

K.1      The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, unless such damages or delay have been caused by fault or gross negligence on the side of the Seller.

K.2      Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

**K.3**    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not onboard of the respective vessel(s).

**K.4.**    Every exemption, limitation, condition and liberty herein contained, and every right, exemption from liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall be available to and shall extend to protect every servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to employed by the Seller/Supplier).

**L.**    EXEMPTIONS AND FORCE MAJEURE

**L.1**    Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage or demurrage due to any delay or failure in their performance (a) by reason of compliance with any order or request of any government authority, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or unavailability of product and/or barge equipment or inadequate for any cause whatsoever that is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused by labour disputes, strikes, governmental intervention, wars, civil commotion, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God, providing that the event cannot be mitigated by the Seller or the Supplier using commercially reasonable efforts. The Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

**L.2**    If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

**L.3**    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same.

**L.3**    In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

**L.4**    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the fuel is being undertaken by a third party.  In such circumstances, these terms and conditions shall be varied accordingly,

and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the third party on the Seller.

(b)    Without prejudice to the generality of the foregoing, in the event that the third party terms include:

(i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

(ii)    Any additional exclusion of liability clause contained in third party terms shall be incorporated mutatis mutandis into these terms and conditions.

(ii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms.

The terms hereof shall be varied to apply any of the terms being imposed on Sellers by the third party supplier.

(c)    It is acknowledged and agreed that the buyer shall not have any rights against the supplier which are greater or more extensive than the rights of the supplier against the Third Party.


M.       BREACH/CANCELLATION

M.1      The Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

          a)       when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

          b)       when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out herein;

          c)       when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2      The Seller may terminate any agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer.

M.3      The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:
         A) The Vessel; or

B) The Charterer of the Vessel; or
C) The fully or partly Owner(s) of the Vessel; or
D) Any officers of the Vessel; or
E) The Operator and/or Manager of the Vessel; or
F) Any other person or entity in any way related to the Agreement or delivery is/are
1) Iranian(s); or
2) Related in any way to Iran or Iranians; or
3) Listed on the US OFAC Specially Designated Nationals List; or
4) Covered by any US, UN, EU sanctions; or
5) Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this clause.
The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items A) to F) in combination with any of the above items 1) to 5) are fulfilled.
Should the Buyer breach its obligation to inform the Seller, the Buyer must indemnify and keep the Seller harmless for any damage or loss caused by such breach, including liquidated damages.


N.          SPILLAGE, ENVIRONMENTAL PROTECTION

N.1         If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the generality of the foregoing the Seller is hereby authorised in its full discretion, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof, that is required by the Seller, or are required by law or regulation applicable at the time and place of delivery.


O.          DELAYS AND CANCELLATIONS

O.1         Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole

discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 48 hours from the (last) nomination date.

O.2    If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller/Supplier as a result of the cancellation, including, but not limited to, barge costs, re-storing of Bunkers, and Hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified in a minimum amount of USD 4,000 by way of agreed liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

P.     LAW AND JURISDICTION

P.1    This agreement shall be governed and construed in accordance with the laws of England.

P.2    All disputes arising in connection with this agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, will be finally settled by arbitration in London under the rules of the London Maritime Arbitrators Association as in effect from time to time by one or more arbitrators appointed in accordance with such rules.

P.3    Any eventual National or International Laws or Regulations (CISG) being referred to by the Buyer in any event, shall be deemed not be valid in any respect, in whole or in part, but solely the articles related to Arbitration as stated elsewhere in this Article P.

P.4    For the sole benefit of the Seller it is further agreed that the Seller without prejudice to any rights hereunder of the Seller or any claim raised pursuant to Clause P.2 above have the right to proceed against the Buyer, any third party or the Vessel in such jurisdiction as the Seller in its sole discretion sees fit inter alia for the purpose of securing payment of any amount due to the Seller from the Buyer or the Owner (pursuant to a payment guarantee). In such circumstances the proceedings shall be governed by the law (substantive and procedural) of such jurisdiction.

Q. ANTICORRUPTION

Q.1    In respect of any services to be provided by the Seller outside of Canada or the United States ("Offshore"), the Seller represents and warrants that none of its or its affiliates' principals, shareholders, directors, officers, employees or its correspondents is an official, agent, employee, or representative of any Offshore national, provincial, or local government, political party, political candidate, or public international organization, nor are any of them immediate family

members (parent, child, spouse, sibling) of such an official, agent, employee, or representative. the Seller shall promptly notify the Buyer if such circumstances change during the term of these Terms. Upon such notification, the Buyer may impose such restrictions on the participation of such personnel in the performance of the Seller's obligations as the Buyer deems necessary to ensure compliance with this provision.

Q.2     In performance of its Offshore obligations under these Terms, neither the Seller, nor any person acting on behalf of the Seller, shall (a) authorize the giving of, offer, or give anything of value to any Offshore government official, a political party or party official, a political candidate, or an official of a public international organization for the purpose of influencing or inducing the recipient to obtain, retain, or direct business for or to any person or for the purpose of securing any improper advantage, or (b) authorize the giving of, offer, or give anything of value to any other person with knowledge or firm belief that all or a portion of the payment or gift will be offered, given, or promised, directly or indirectly, to any of the persons described in subparagraph (a), for any of the purposes stated in subparagraph (a).

Q.3     The Seller shall not retain any agents, subagents, representatives, consultants, correspondents or other persons to assist in carrying out the Seller's Offshore duties under this Agreement without the prior written consent of the Buyer.

Q.4     If the Seller's Offshore performance under these Terms is determined by the Buyer to be contrary to (a) the Canadian Corruption of Foreign Public Officials Act, (b) the U.S. Foreign Corrupt Practices Act, or (c) the Seller's representations as set forth in these Terms, then these Terms shall be null and void from its inception, and in such event any Offshore compensation paid or accrued shall be forfeited by the Seller, and no future Offshore payments or accruals shall be made by the Buyer for the Seller's account.

# EXHIBIT 3

# OW BUNKERS (UK) LTD.
# OWB UK RS



Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111 2nd Avenue South
CA-S7K 3R7 Saskatoon, Saskatchewan
Canada
Timur Rudnitskiy

First Floor, Pilgrim House
2-6 William Street
Windsor, Berkshire SL4 1BA
Great Britain
Phone +44 1753 483300
Fax    +44 1753 483310
E-mail owbunkersuk@owbunker com
Internet http www owbunker com
Reg No 3978855
ING Bank N V
IBAN NL26 INGB 0020 1180 31
IBAN NL10 INGB 0651 3696 81
SWIFT INGBNL2A
IBAN NL26 INGB 0020 1180 31
SWIFT INGBNL2A

## Sales Order Confirmation

London 7 October 2014

Sales Order No.    24-29015

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | GLOBAL PHOENIX (IMO 9565053) |
| Port | PORTLAND(OR USA) |
| Delivery date | Between 11 October 2014 and 14 October 2014 |
| Seller | OW BUNKERS (UK) LIMITED |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV GLOBAL PHOENIX AND/OR CANPOTEX SHIPPING SERVICES LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 600,00-750,00 | MT | Fueloil 380-CST 3,5% | USD | 622,00 | MT | Chevron Marine Products LLC |
| 1,00 | LPS | Environmental fee | USD | 60,00 | LPS | Chevron Marine Products LLC |

| | |
|---|---|
| Agent | Willhelmsen |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX) COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 RMG380 Booming fee if applicable USD 1750 lps MARPOL ANNEX COMPLIANCE CONFIRMED |

We thank you for this nomination.

Kind Regards

Giorgia Franchini

| | |
|---|---|
| Direct | +44 1753 483 306 |
| Mobile | +44 7977 462 555 |
| Yahoo ID | gfr_owbunker |
| E-Mail | gfr@owbunker com |
| Office E-Mail | owbunkersuk@owbunker com |

# OW BUNKERS (UK) LTD.
# OWB UK RS



TERMS AND CONDITIONS.
--------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to OW BUNKERS (UK) LIMITED as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.

PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

## BEFORE BUNKERING

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks) Compare measurements and verify the quantities as per barge ullage tables When in full agreement please sign the ullage/sounding report for Before Supply figures If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

## DURING BUNKERING

Always place a watchman to witness safe operation including also proper and correct sampling The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes All seal numbers to be inserted into the Bunker Delivery Receipt (BDR) The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose, and any un agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks which stripping to be agreed in advance by both parties If air is blown on continued basis and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply Pay special attention hereto and take all necessary precautions to observe, which includes
  - During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
  - Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
  - Agree with the barge when and if they are going to make stripping of their tanks
  - Check and note the draft fore, mid and aft on the barge before and after supply to compare
  - If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far
  - Contact vessel operator in charge and request notification to the Seller and Supplier immediately
  - If surveyor attending please ensure that the surveyor signs a Letter of Protest also
  - After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master

## AFTER COMPLETION

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply

## QUANTITY COMPLAINTS

**Chevron**

Bunker Delivery Note

| Port/Delivery Location | IMO Number of Receiving Vessel |
|---|---|
| PANAMA | 9 5 6 5 053 |

| Bunkers Delivered to MV or S/S | Vessel Flag | Next Port of Call |
|---|---|---|
| GLOBAL PHOENIX | PANAMA | BRAZIL |

| Owner/Operator or Account of | Ship's Agent | Voyage Destination |
|---|---|---|
| O.W. BUNKER USA | WILHELMSEN | |

| Loading Terminal | Contracting Company |
|---|---|
| PTSI- PORTLAND, OR- USA | OLYMPIC TUG & BARGE |

| Product Analysis | RMG 380 | Nomination Ref. Number |
|---|---|---|
| Density @ 15°C / API @ 60°F | 0.9910 | |
| Viscosity cSt - 50°C | 288 | OWBUC14TS0003 |
| Sulfur % (m/m) | 2.64 | Date of Commencement of Delivery |
| Water % (v/v) | 0.05 | |
| Flashpoint PM °F° | 167° | 16 OCT 2014 |

Delivery Method: ☐ Shore Tank ☑ Barge ☐ Tank Truck   UTB

| Product | Barge Name | Alongside Vessel | | Connection Made | | Started Discharging | | Finished Discharging | | Hoses Off | | Departed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date |
| RMG 380 | INVESTIGATOR | 1945 | 16Oct14 | 2035 | 16Oct14 | 2055 | 16Oct14 | 0005 | 17Oct14 | 0015 | 17Oct14 | 0030 | 17Oct14 |

| Shore Tank or Barge Tank | Product Name | Opening | | | Closing | | | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| | | MT/FT CM/IN | Quantity | Temp °C / °F | MT/FT CM/IN | Quantity | Temp °C / °F | |
| 3P | RMG 380 | 5-2¾ | 1487.88 | 125° | 14-6¾ | 15.53 | 60° | |
| 3S | | 5-2 | 1487.85 | | 14-6¾ | 15.56 | | |
| 4S | | 5-10¾ | 1411.65 | | 14-7 | 15.57 | | 4306.20 |
| | | | 4552.56 | | | 46.66 | | |

| Product Description | Gross Quantity (Units) | Temp. °C / °F | Temperature Correction Factor | Billing Quantities | | | |
|---|---|---|---|---|---|---|---|
| | | | | Barrels / Liters Net @15°C / 60°F | Vol. to Weight Conversion Factor | Metric Tons Net | |
| Fuel Oil RMG 380 | 4306.20 | 125° | .15721 | 4199.40 | .9752 | 4095.18 MT | |
| Fuel Oil          cSt | | | | | | | |
| Marine Diesel | | | | | | | |
| Gas Oil | | | | | | | |

Samples were taken, sealed and distributed as follows:

Vessel Sample #'s  S-1193758

Supplier Sample #'s  B1-1193757, B2-1147281

Surveyor Sample #'s (if required) _____

Marpol Sample #'s  SM-1193810

Others (if required) _____

I confirm that the above product was delivered, appropriate samples have been received and that the quantity supplied was witnessed and found correct.

Signature: _Mario S. Sing_ (Master/Chief Engineer)

Print Name: MARIO SING (Block Letters)

Vessel Stamp:

The fuel oil supplied is in conformity with regulations 14 (1) of or (4) (a) and regulation 18 (1) of annex VI to MARPOL 73/78   Chevron Marine Products LLC

Name, Address and Telephone of Supplier: 6001 Bollinger Cyn RD Bldg 1, 3rd Floor
San Ramon, CA 94583  (925) 842-3796

Signature of Supplier's Representative: _____

Print Name (Block Letters)  KELLY LINDBLOM

Supplier's gauges and sampling witnessed by customer's representative.
Yes / Declined

Was a note of protest issued?   Yes / No

Remarks:  MSDS DELIVERED TO VESSEL

White copy: Original  Blue copy: Ships  Green copy: Compliance  Canary copy: Ops center  Pink copy: Terminal  Gold copy: Barge

R-264 (7-10)



M/V GLOBAL PHOENIX
AND OR OWNERS CHARTERERS

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, Saskatchewan, CA-S7K 3R7
CanadaT
Timur Rudnitskiy

PORT: PORTLAND(OR USA)
YOUR REFERENCE:

| | | | |
|---|---|---|---|
| DATE OF INVOICE | : | 16. October 2014 | |
| INVOICE NO | : | 24-30906 | |
| ORDER NO. | : | 24-29015 | |
| DATE OF SUPPLY | : | 16. October 2014 | |
| DUE DATE | : | 15. November 2014 | |

| Quantity supplied | Quality description | Price per | Invoice amount |
|---|---|---|---|
| 1,000 LPS | Environmental fee | 60,00 LPS | 60,00 |
| 660,180 MT | Fueloil 380-CST 3,5% | 622,00 MT | 410.631,96 |

| | | | |
|---|---|---|---|
| Your VAT No. | | VAT Amount | USD | 0,00 |
| Our VAT No | GB 727 4450 31 | Total | USD | 410.691,96 |

The prices are excl. all taxes and or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions.

BANK:       ING Bank N.V

ACCOUNT:   IBAN: NL26 INGB 0020 1180 31      USD and all other currencies
           IBAN: NL10 INGB 0651 3696 81      EUR

           SWIFT: INGBNL2A

OW BUNKERS (UK) LIMITED
Pilgrim House
William Street
GB-SL4 1BA Windsor Berkshire

Phone +44 1753 483390
Fax    +44 1753 483310

E-mail: owbunkersuk@owbunker.com

# EXHIBIT 4

# OW BUNKERS (UK) LTD.
# OWB UK RS

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111 2nd Avenue South
CA-S7K 3R7 Saskatoon, Saskatchewan
Canada
Timur Rudnitskiy

(W) Bunker

First Floor, Pilgrim House
2-6 William Street
Windsor, Berkshire SL4 1BA
Great Britain
Phone +44 1753 483300
Fax +44 1753 483310
E-mail owbunkersuk@owbunker com
Internet http www owbunker com
Reg No 3978855
ING Bank N V
IBAN NL26 INGB 0020 1180 31
IBAN NL10 INGB 0651 3696 81
SWIFT INGBNL2A
IBAN NL26 INGB 0020 1180 31
SWIFT INGBNL2A

## Sales Order Confirmation

London 14 October 2014

Sales Order No.  24-29076

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | CMB GIULIA (IMO 9588419) |
| Port | PORTLAND(OR USA) |
| Delivery date | Between 17 October 2014 and 20 October 2014 |
| Seller | OW BUNKERS (UK) LIMITED |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV CMB GIULIA AND/OR CANPOTEX SHIPPING SERVICES LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 1 00 | LPS | Surcharge | USD | 60 00 | LPS | Chevron |
| 464 00 | MT | Fueloil 380-CST 3 5% | USD | 617 00 | MT | Chevron Delivery Barge |
| 100 00 | MT | 380-CST 1% | USD | 826 00 | MT | Chevron Delivery Barge |

| | |
|---|---|
| Agent | |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX) COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 |

We thank you for this nomination.

Kind Regards

Anders Stom

| | |
|---|---|
| Direct | +44 17 5348 3304 |
| Mobile | +44 78 1398 9156 |
| Yahoo ID | anst_owbunker |
| E-Mail | anst@owbunker com |
| Office E-Mail | owbunkersuk@owbunker com |

# OW BUNKERS (UK) LTD.
# OWB UK RS



TERMS AND CONDITIONS.
-------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to OW BUNKERS (UK) LIMITED as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

# OW BUNKERS (UK) LTD.
# OWB UK RS



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

## BEFORE BUNKERING

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks) Compare measurements and verify the quantities as per barge ullage tables When in full agreement please sign the ullage/sounding report for Before Supply figures If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

## DURING BUNKERING

Always place a watchman to witness safe operation including also proper and correct sampling The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes All seal numbers to be inserted into the Bunker Delivery Receipt (BDR) The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply Pay special attention hereto and take all necessary precautions to observe, which includes
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
- Agree with the barge when and if they are going to make stripping of their tanks
- Check and note the draft fore, mid and aft on the barge before and after supply to compare
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master

## AFTER COMPLETION

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply

## QUANTITY COMPLAINTS

# Chevron

## Bunker Delivery Note

| Port/Delivery Location | | IMO Number of Receiving Vessel |
|---|---|---|
| Port or I-5 Bulk | | 9588419 |

| Bunkers Delivered to M/V or S/S | Vessel Flag | Next Port of Call |
|---|---|---|
| CMB GIULIA | Hong Kong | South Korea |

| Owner/Operator or Account of | Ship's Agent | Voyage Destination |
|---|---|---|
| O.W. Bunker USA Inc. | | |

| Loading Terminal | Contracting Company |
|---|---|
| PTSI - Portland, OR - USA | Olympic Tug & Barge |

| Product Analysis | RMG 380 | IF 380 1% | Nomination Ref. Number |
|---|---|---|---|
| Density @ 15°C /API @ 60°F | 0.9902 | 0.9898 | |
| Viscosity cSt - 50°C | 246.4 | 193.6 | OWBUC14TS0004 |
| Sulfur % (m/m) | 2.39 % | 0.887 | Date of Commencement of Delivery |
| Water % (v/v) | 0.00 % | 0.05 % | |
| Flashpoint PM °C °F | 174° | 230° | 10/20/14 |

Delivery Method: ☐ Shore Tank ☒ Barge ☐ Tank Truck    Olympic Tug & Barge

| Product | Barge Name | Alongside Vessel | | Connection Made | | Started Discharging | | Finished Discharging | | Hoses Off | | Departed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date | Hour | Date |
| IF 380 1% | Investigator | 0715 | 10-20 | 0800 | 10-20 | 0840 | 10-20 | 0910 | 10-20 | 1250 | 10-20 | 1300 | 10-20 |
| RMG 380 | | | | | | 0926 | | 1220 | | | | | |

| Shore Tank or Barge Tank | Product Name | Opening | | Temp °C / °F | Closing | | Temp °C / °F | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| | | MT/FT CM/IN | Quantity | | MT/FT CM/IN | Quantity | | |
| 2P | IF 380 1% | 10'5¼" | 105¼" | 127° | 146⅜" | 15.48 | 60° | 653.98 |
| 3P | RMG 380 | 5'8¾" | 1440.44 | 135° | 146¾" | 15.53 | | 3044.87 |
| 3S | | 4'6" | 1639.52 | | 146¾" | 15.56 | | |

| Product Description | Gross Quantity (Units) | Temp °C / °F | Temperature Correction Factor | Billing Quantities | | | |
|---|---|---|---|---|---|---|---|
| | | | | Barrels / Liters Net @ 15°C / 60°F | Vol. to Weight Conversion Factor | Metric Tons Net | |
| Fuel Oil 380 1% ....cSt | 653.98 | 127° | .9744 | 637.83 | .15710 | 100.11 | |
| Fuel Oil RMG 380 ...cSt | 3044.87 | 135° | .9713 | 2957.48 | .15781 | 464.94 | |
| Marine Diesel | | | | | | | |
| Gas Oil | | | | | | | |

Samples were taken, sealed and distributed as follows:

Vessel Sample #'s  1155411-S (1%), 1155410-S (380)

Supplier Sample #'s  1155586-B2 (1%), 1155269-B2, 1155062-B (380), 1155351-B2 (380)

Surveyor Sample #'s (if required) _____

Marpol Sample #'s  1155353-SM (1%), 1155430-SM (380)

Others (if required) _____

I confirm that the above product was delivered, appropriate samples have been received and that the quantity supplied was witnessed as correct.

Signature: _____
(Master/Chief Engineer)

Print Name: RUSTER ARCENAL
(Block Letters)

Vessel Stamp:



M.V. CMB GIULIA
HONG KONG
CALL SIGN ...... VRJQ4
IMO NO. ...... HK-3315
IMO NO. ...... 9588419
GRT ...... 22137
NRT ...... 11328
POWER ...... 6480 KW

The fuel oil supplied is in conformity with regulations 14 (1) or (4) (a) and regulation 18 (1) of annex VI to MARPOL 73/78

Name, Address and Telephone of Supplier: Chevron Marine Products LLC

Signature of Supplier's Representative: 6001 Bollinger Cyn RD Bldg 1, 3rd Floor
San Ramon, CA 94583 (925) 842-3796

Print Name (Block Letters): _____

Supplier's gauges and sampling witnessed by customer's representative:  (Yes) Declined

Was a note of protest issued?  Yes / (No)

| Remarks: | MSDS Delivered to vessel | *This product meets a 1% sulfur specification. It is not intended for use as ECA Marine Fuel per 40 CFR § 80.511(b)(9)* |
|---|---|---|

R-264 (7-10)

White copy: Original; Blue copy: Ship's; Green copy: Comptroller; Canary copy: Ops center; Pink copy: Terminal; Gold copy: Barge

 **Bunker**

M/V CMB GIULIA
AND OR OWNERS CHARTERERS

Canpotex Shipping Services Ltd
PO Box 1600
Suite 400, 111 2nd Avenue South
Saskatoon, Saskatchewan, CA-S7K 3R7
CanadaT
Timur Rudnitskiy

DATE OF INVOICE : 20. October 2014

INVOICE NO : 24-30907

ORDER NO. : 24-29076

DATE OF SUPPLY : 20. October 2014

PORT: PORTLAND(OR USA)
YOUR REFERENCE:

DUE DATE : 19. November 2014

| Quantity supplied | Quality description | Price per | Invoice amount |
|---|---|---|---|
| 1,000 LPS | Enviornmental Fee | 60,00 LPS | 60,00 |
| 464,940 MT | Fueloil 380-CST 3,5% | 617,00 MT | 286.867,98 |
| 100,110 MT | 380-CST 1% | 826,00 MT | 82.690,86 |

| | | | |
|---|---|---|---|
| Your VAT No. | | VAT Amount USD | 0,00 |
| Our VAT No. | GB 727 4450 31 | Total USD | 369.618,84 |

The prices are excl. all taxes and or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | | |
|---|---|---|---|
| BANK: | ING Bank N.V. | | OW BUNKERS (UK) LIMITED |
| | | | Pilgrim House |
| ACCOUNT: | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies | William Street |
| | IBAN: NL10 INGB 0651 3696 81 | EUR | GB SL4 1BA Windsor Berkshire |
| | | | |
| | SWIFT: INGBNL2A | | Phone +44 1753 483300 |
| | | | Fax +44 1753 483310 |

E-mail owbunkersuk@ow.nl.ow.com

# EXHIBIT 5

# OW BUNKERS (UK) LTD.
# OWB UK RS



Canpotex Shipping Services Ltd
PO Box 1600
Suite 400 111 2nd Avenue South
CA-S7K 3R7 Saskatoon Saskatchewan
Canada
Timur Rudnitskiy

First Floor Pilgrim House
2-6 William Street
Windsor Berkshire SL4 1BA
Great Britain
Phone +44 1753 483300
Fax    +44 1753 483310
E-mail owbunkersuk@owbunker com
Internet http www owbunker com
Reg No 3978855
ING Bank N V
IBAN NL26 INGB 0020 1180 31
IBAN NL10 INGB 0651 3696 81
SWIFT INGBNL2A
IBAN NL26 INGB 0020 1180 31
SWIFT INGBNL2A

## Sales Order Confirmation

London 17 October 2014

Sales Order No  24-29094

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | ASTON TRADER II (IMO 9392731) |
| Port | PORTLAND(OR USA) |
| Delivery date | Between 22 October 2014 and 27 October 2014 |
| Seller | OW BUNKERS (UK) LIMITED |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV ASTON TRADER II AND/OR CANPOTEX SHIPPING SERVICES LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 550 00 | MT | Fueloil 380 CST 3 5% | USD | 603 00 | MT | Chevron Delivery Barge |

| | |
|---|---|
| Agent | |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX) COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 |

We thank you for this nomination

Kind Regards

Anders Stom

| | |
|---|---|
| Direct | +44 17 5348 3304 |
| Mobile | +44 78 1398 9156 |
| Yahoo ID | anst_owbunker |
| E-Mail | anst@owbunker com |
| Office E-Mail | owbunkersuk@owbunker com |

# OW BUNKERS (UK) LTD.
# OWB UK RS



TERMS AND CONDITIONS.
-------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to OW BUNKERS (UK) LIMITED as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.



**GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS**

**BEFORE BUNKERING:**

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

**DURING BUNKERING:**

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

**AFTER COMPLETION:**

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

**QUANTITY COMPLAINTS:**

**Chevron**

**Bunker Delivery Note**

| Port/Delivery Location | | IMO Number of Receiving Vessel |
|---|---|---|
| OXOL | | 9 3 9 2 7 3 1 |

| Bunkers Delivered to M/V or S/S | Vessel Flag | Next Port of Call |
|---|---|---|
| ASTON TRADER II | PHILIPPINES | Mexico |
| Owner/Operator or Account of | Ship's Agent | Voyage Destination |
| C.W. BUNKER USA INC. WILHELMSEN | | |
| Loading Terminal | | Contracting Company |
| PTSI — PORTLAND, OR — USA | | |

| Product Analysis | RMG 380 | | | Nomination Ref. Number |
|---|---|---|---|---|
| Density @ 15°C /API @60°F | 0.9903 | | | |
| Viscosity cSt - 50°C | 223 | | | OWBUC14TS0008 |
| Sulfur % (m/m) | 2.21 | | | Date of Commencement of Delivery |
| Water % (v/v) | 0.00 | | | 10/31/14 |
| Flashpoint PM °X F° | 176° | | | |

Delivery Method: ☐ Shore Tank  ☑ Barge  ☐ Tank Truck       OTB

| Product | Barge Name | Alongside Vessel Hour | Date | Connection Made Hour | Date | Started Discharging Hour | Date | Finished Discharging Hour | Date | Hoses Off Hour | Date | Departed Hour | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RMG380 | Barracuda | 0730 | 10-31 | 0815 | 10-31 | 0840 | 10-31 | 1110 | 10-31 | 1125 | 10-31 | 1130 | 10-31 |

| Shore Tank or Barge Tank | Product Name | Opening MT/FT CM/IN | Quantity | Temp °C /°F | Closing MT/FT CM/IN | Quantity | Temp °C /°F | Gross Barrels / Liters |
|---|---|---|---|---|---|---|---|---|
| 3P | RMG380 | 4'5 | 1645.42 | 130° | 14674 | 15.53 | 160° | |
| 3S | | 8'4½ | 1009.16 | | 14876 | 15.56 | | 3599.11 |
| 4S | ⟂ | 8'6 | 991.19 | ⟂ | 14'7 | 15.57 | ⟂ | |

| Product Description (Units) | Gross Quantity (Units) | Temp °C /°F | Temperature Correction Factor | Barrels / Liters Net @15°C / 60°F | Vol. to Weight Conversion Factor | Metric Tons Net |
|---|---|---|---|---|---|---|
| Fuel Oil RMG380 cSt | 3599.11 | 130° | .9732 | 3502.65 | .1577 | 550.65 |
| Fuel Oil cSt | | | | | | |
| Marine Diesel | | | | | | |
| Gas Oil | | | | | | |

Samples were taken, sealed and distributed as follows:

Vessel Sample #'s 1155188-S

Supplier Sample #'s 1155168-B1, 1155159-B2

Surveyor Sample #'s (if required) _____

Marpol Sample #'s 1155167SM

Others (if required) _____

I confirm that the above product was delivered, appropriate samples have been received and that the quantity supplied was witnessed as correct.

Signature: _____ (Master/Chief Engineer)

Print Name: DAN V. BABIERA (Block Letters)

Vessel Stamp:

**M/V " ASTON TRADER II "**

The fuel oil supplied is in conformity with regulations 14 (1) or (4) (a) and regulation 18 (1) of annex VI to MARPOL 73/78

Name, Address and Telephone of Supplier: _____

Signature of Supplier's Representative: _____

Print Name (Block Letters): _____

Supplier's gauges and sampling witnessed by customer's representative:   Yes / Declined

Was a note of protest issued?   Yes / No

Remarks: MSDS DELIVERED TO VESSEL

R-264 (7-10)

White copy: Original; Blue copy: Ship's; Green copy: Comptroller; Canary copy: Ops center; Pink copy: Terminal; Gold copy: Barge